[Sac. No. 7841.   In Bank.   Mar. 28, 1969.]

GLENN R. SEWELL SHEET METAL, INC., et al., Plaintiffs, Cross-defendants and Appellants, v. NICK LOVERDE et al., Defendants, Cross-complainants and Appellants; BERTHA A. MILLER et al., Cross-complainants, Cross-defendants and Respondents.

Miller, Ford & O'Neal and Charles J. Miller for Plaintiffs, Cross-defendants and Appellants.

Pierce Deasy for Defendants, Cross-complainants and Appellants.

Perkins, Carr & Anderson for Cross-complainants, Cross-defendants and Respondents.

TRAYNOR, C. J.—Plaintiffs and cross-defendants Glenn R. Sewell Sheet Metal, Inc., and Glenn R. Sewell appeal from an adverse judgment in their action for declaratory relief against defendants and cross-complainants Nick and Ellen Loverde, Sewell's sublessors, to declare Sewell's sublease unenforcible and to recover a $3,000 deposit. The Loverdes cross-complained against cross-defendants and cross-complainants Bertha A. Miller, also known as Bertha A. Perkins, and Thomas C. Perkins alleging that if the Sewell-Loverde sublease is unenforcible the Loverdes' lease with the Perkinses is likewise unenforcible.

This controversy arises out of the abandonment by Sewell of premises leased to the Loverdes and subleased to Sewell. The abandonment occurred when a septic system on the premises failed, precluding further use of the premises as a trailer court unless adequate sewer connections were made.

On September 1, 1948, the Perkinses leased a parcel of land to Howard and Evelyn McCrum for a 10-year term with an option to renew for five years. The premises included a house and a store. The house was to be used as a home; the rest of the premises could be used only for retail store, restaurant, or agricultural uses. The lessees covenanted to maintain the premises in as good or better condition than they were in at the time of the lease.

On August 13, 1951, with the approval of the Perkinses, the McCrums assigned the lease to the Loverdes, who assumed the covenants therein. On September 1, 1958, the Loverdes exercised their option to extend the lease to 1963. At the same time the lease was modified to grant the Loverdes another option to renew for an additional three years, i.e., until August 31, 1966, and to remove all restrictions on the use of the premises thus permitting the Loverdes to continue using the premises for an auto repair business, a use not within the original permitted uses.

On May 6, 1963, Sewell, who had previously subleased the store building for use in his sheet-metal business, subleased the entire premises from the Loverdes for the period of the additional three-year option (1963-1966). At that time the Loverdes were using the premises as a trailer park for which they had previously installed the necessary improvements, including the septic system involved in this action.

Sewell successfully operated the premises as a trailer park until sometime after September 1964, when difficulties arose with the septic system. Sewell spent some $3,500 to alleviate the resulting pooling of effluent on the grounds, but was unable to rectify the defect. On September 16, 1965, the Sacramento County Department of Public Health ordered Sewell to connect the trailer park sewage system to nearby public sewer lines or to terminate the use of the premises as a trailer park.[1] After determining that the required connection would cost approximately $7,500, and that neither the Perkinses nor the Loverdes were willing to pay for the connection, Sewell elected to terminate his operation of the trailer park and ordered the occupants to leave. After unsuccessfully attempting to negotiate a return to his sublease of the store alone, Sewell abandoned the premises 11 months before the termination date of the sublease and paid no rent for that period.

[1]The Department of Public Health invoked Health and Safety Code section 18377 and Sacramento County Ordinance No. 378 in support of its order. Section 18377 had previously been in force as sections 18378 (1955-1961) and 18683 (1941-1955) Health and Safety Code, respectively. Section 18377, as amended by Statutes 1965, chapter 1510, page 3552, section 25, is now section 18054, Health and Safety Code. The section in its various forms, has always prohibited the deposition of trailer effluent upon the ground. Sacramento County Ordinance No. 378, enacted October 3, 1950, regulates the operation of sewage disposal systems in unincorporated areas of Sacramento County. The foregoing laws were in effect before the assignment of the master lease to the Loverdes and at all times thereafter. The validity of the action of the Sacramento County Department of Public Health is not in issue.

Sewell contends that he was justified in abandoning the premises and that he therefore owes no rent and is entitled to the return of $3,000 he paid in advance.[2]

The question presented is which party had the duty under the terms of the lease and sublease and the applicable law to comply with governmental laws and orders governing the use of the premises.

At the outset we distinguish two similar but unrelated duties that often overlap and may create unnecessary confusion. The first, not directly involved in this case, is the duty to repair or maintain the premises in the absence of special laws or governmental orders. ▉ Since no general public policy requires that private property and the improvements thereon be maintained in good condition at all times, a private property owner is under no general duty to correct defective conditions,[3] and the fact that he leases the premises to another does not alter the rule. (*Cowell* v. *Lumley* (1870) 39 Cal. 151, 153 [2 Am.Rep. 430]; *Strecker* v. *Barnard* (1952) 109 Cal. App.2d 149, 152 [240 P.2d 345] and cases cited).[4] ▉ Similarly a lessee is under no general duty to correct defective conditions on the leased premises except when necessary to prevent waste or to rectify dilapidations caused by his own lack of ordinary care. (Civ. Code, §§ 1928, 1929; 1 American Law of Property (A. J. Casner ed. 1952) § 3.78, pp. 346-348.)[5] Thus, with regard to the duty to repair or maintain, many dilapidations may go unrectified, neither the lessor nor the lessee having a duty to ameliorate the condition, but each having assumed the risk that the dilapidation will decrease the use or value of his interest. (*Western Motors Servicing*

[2]Until his abandonment, Sewell paid all rent as it came due, including the full rental for the first six months, even though he had made a $3,000 advance payment to cover part of that rent. His rent for the entire premises was $725 per month, representing the $500 per month owing from the Loverdes to the Perkinses plus an additional $225 per month. When he had subleased the store building alone his rent had been $140 per month.

[3]He may not, however, allow property under his control to become a nuisance and, if he permits others to come upon the property, he may be required to maintain the property in a safe condition. (See 2 Witkin, Summary of Cal. Law (7th ed. 1960) pp. 1440-1472.)

[4]Specific preventative or reparative duties may of course be imposed by statute (e.g., Civ. Code, § 1941) or special circumstances (see, e.g., *Janofsky* v. *Garland* (1941) 42 Cal.App.2d 655, 657 [109 P.2d 750]; Rest., Torts, § 362) or may be created by agreement between the parties.

[5]The lessee may assume further duties by agreement and, in special circumstances, additional duties may be imposed by law. (See fn. 3, *infra.*)

*Corp.* v. *Land Dev. & Inv. Co.* (1957) 152 Cal.App.2d 509, 513 [313 P.2d 927].)

A different conclusion must be reached however, when preventative or reparative actions are required by laws and orders governing the premises and their uses. In such a case ·public policy requires that someone at all times be obliged to comply with such laws and orders, and parties to a lease will not be permitted to create a hiatus in their respective duties of compliance. One or more of the parties interested in the property must therefore be obliged to comply with some or all of the laws and orders affecting the premises. Since the property owner is initially under the duty to comply with all laws and orders, he, as lessor, remains subject to that duty unless it is assumed by the lessee. (1 American Law of Property, *supra,* § 3.80, pp. 353-355; 2 Walsh, Commentaries on the Law of Real Property (1947) § 165, pp. 232-233. Cases on the allocation between a lessor and lessee of the duty to comply with applicable laws are collected in Annot. (1924) 33 A.L.R. 530-541 and Annot. (1968) 22 A.L.R.3d 521, 555.)

There are three ways in which a lessee may obligate himself to comply with laws and orders. One is unrelated to this case ;[6] the other two will be discussed in the order in which they arose in the transactions before us.

A lessee who voluntarily puts the premises to uses different from those to which they were put before the creation of his tenancy, and thereby causes the premises to fall within the scope of existing laws[7] not previously applicable to the premises, must bear the burden of conforming his new use to the requirements of the law and of taking all action necessary to rectify any subsequent instances of noncompliance. This rule applies whether the lessee's obligation is viewed as arising from an implied assumption of the lessor's initial

---

[6]In some states, including California, the creation of the lessor-lessee relationship itself imposes upon the lessee a minimal duty of compliance with applicable laws. Such a duty extends only to those required activities that are truly minor in expense and inconvenience, that arise out of the ordinary course of the lessee's use of the·premises, and· that would in·no event impose upon the lessee a burden greater than that imposed by the common law duty to prevent waste. (See *Wall Estate Co.* v. *Standard Box Co.* (1912) 20 Cal.App. 311 [128 P. 1020] [modernization of toilets in a factory]; *Finnegan* v. *Royal Realty Co.* (1950) 35 Cal.2d 409,,432 [218 P.2d 17] [indicating ·that the duty does not extend to activities that create ''permanent'' improvements or yield a ''substantial benefit'' to the reversion].)

[7]We need not consider the question whether it is the lessee's or the lessor's duty to comply with a new law passed after the lessee has undertaken a new use of the premises.

duty not to alter the use of the premises under his control without complying with all applicable laws (see *Pross* v. *Excelsior Cleaning & Dyeing Co.* (1919) 110 Misc. 195 [179 N.Y.S. 176, 180] (dicta); *Clarke* v. *Yukon Inv. Co.* (1915) 83 Wash. 485 [145 P. 624, 627, Ann. Cas. 1916E 625] (dicta)), or whether it is viewed as reflecting an independent duty to comply with the particular laws made applicable by the lessee's new use of the premises. (See *Mulligan* v. *Fioravera* (1930) 228 App.Div. 270 [239 N.Y.S. 438, 442] (dicta); *Johnson* v. *Snow* (1903) 102 Mo.App. 233 [76 S.W. 675, 677] (dicta), revd. on other grounds, 201 Mo. 450 [100 S.W. 5] (1907).) Under either theory the reason for imposing the duty on the lessee remains the same. If he were free to modify the use of the premises as he wished[8] and did not by such modification assume the duty to comply with applicable laws, he would have the lessor at his mercy. "[A] landlord might be called upon to meet the cost of fire escapes, if the lessee decided to open a rooming house. If that use proved unprofitable, the tenant might use the property as a theatre . . . and the landlord would be compelled to provide such additional exits and escapes [as required by law], or, that venture failing, he might be called upon to meet the expenses of adapting the premises to the [governmental] requirements of a restaurant, if the lessee willed to engage in it." (*Clarke* v. *Yukon Inv. Co., supra,* 145 P. 624, 625.) ▮ It would be inequitable to impose such a burden upon the Perkinses in this case. They permitted the Loverdes to make whatever use of the premises the Loverdes wished. When the Loverdes ceased to use the premises for automobile repairs and converted them to a trailer park, the duty became theirs to make the new use conform to all laws and orders applicable to a trailer park. They therefore had the initial duty to comply with laws governing the septic system that they had installed.

We turn to the relation between the Loverdes and Sewell who, as between themselves, were lessor and lessee respectively. Since Sewell did not change the Loverdes' use of the premises as a trailer park, no assumption of the duty to comply with the laws applicable to that use arose under the rule discussed above. ▮ A lessor is free, however, to transfer

---

[8]We do not consider the application of the foregoing rule to those situations where the lease restricts the use of the premises, nor those where the lessor has a direct interest in the specific use to which the lessee puts the premises (e.g., where the rent is related to the profits to be derived from the lessee's use).

his obligations to his lessee by an agreement in which the lessee assumes the duty of compliance and the risk that the performance of such duty may prove expensive or inconvenient.

We must therefore interpret the terms of Sewell's sublease[9] to determine whether he assumed that duty and risk. (Civ. Code, §§ 1635-1657; *Realty & Rebuilding Co.* v. *Rea* (1920) 184 Cal. 565, 575-576 [194 P. 1024].) Under paragraph D of the sublease, Sewell agreed to comply with "requirements of applicable federal, state, county, city and district laws, ordinances, rules and regulations. . . ." ▪ Although this general covenant literally applies to the order of the Sacramento County Department of Public Health that public sewer connections be made or the trailer park operations be terminated, the general rule is that a lessee's unqualified covenant to comply with applicable laws, standing alone, does not constitute an assumption of the duty to comply with those laws that require curative actions of a "substantial" nature.[10]

[9]The relevant provisions of the sublease are:

"(D) Sub-lessee is conversant with all of the terms of the basic lease and the modification thereof and he agrees that he will occupy and dispose the leasehold estate in a manner commensurate with the requirements and limitations imposed by said basic lease and by the requirements of applicable, federal, state, county, city and district laws, ordinances, rules and regulations pertaining to any and all segments of the operations and uses to which the property may be subjected or put.

"(E) That the Sub-lessee has examined and knows the condition of said premises, and that no representations as to the condition or repair thereof have been made by the Sub-lessors, prior to, or at the execution of this lease, that are not herein expressed or endorsed hereon.

"(F) Sub-lessors shall be under no obligation hereunder for the repair or maintenance of any of the improvements upon said demised premises.

"(I) Sub-lessee assumes all risk of loss by reason of injury or damage to person or property occasioned in consequence of the use and occupation of said premises by Sub-lessee and Sub-lessee does hereby specifically agree to indemnify Sub-lessors from and against all manner of claims, cost, expense or damage in consequence of the use and occupation of such property. . . ."

[10]See: Annot., *supra,* 22 A.L.R.3d 521, sections 6-12, pages 529-555; Annot., *supra,* 33 A.L.R. 530, sections II, III, pages 530-541. Compare *Strecker* v. *Barnard* (1952) 109 Cal.App.2d 149 [240 P.2d 345], with *Browning* v. *Aymard* (1964) 224 Cal.App.2d 277 [36 Cal.Rptr. 604]. See also, 1 American Law of Property, *supra,* section 3.80, pages 353-355. This rule also applies to covenants to repair or maintain. The labels "substantial" and "non-substantial" are obviously conclusory; they reflect a court's determination whether or not the parties to a lease agreed that the lessee assumed certain risks, despite the use of unqualified language. The courts occasionally indicate the factors that offer insight into the probable intent of the parties such as: (1) the relationship of the cost of the curative action to the rent reserved, (2) the term for which the lease was made, (3) the relationship of the benefit to the lessee to that of the reversioner, (4) whether the curative action is structural

Sewell's general covenant to comply does not, however, stand alone. Even if the sewer connections were classified as "substantial" within the meaning of the foregoing rule, provisions of the sublease other than paragraph D make it clear that Sewell assumed the duty to comply with the order in question.

■ Sewell not only covenanted to comply with all applicable laws, but represented, in paragraphs E and F, that he had examined the premises and knew of their condition, that the Loverdes had made no representation as to their condition, and that the Loverdes were relieved of all obligations as to the repair or maintenance of the improvements thereon. In the absence of a covenant by the Loverdes to repair or maintain the improvements, their only obligation in this respect would arise from the duty to comply with applicable laws.[11] Under these circumstances the Loverdes' disclaimer of any obligation at all under paragraphs E and F can be given effect only by interpreting them to relieve the Loverdes of any duty to take those "substantial" curative actions required by law that the language of paragraph D alone would not cover. (See *Rose* v. *Long* (1954) 128 Cal.App.2d 824 [275 P.2d 925].) Moreover, in paragraph I Sewell agreed to assume all risk of loss by reason of damage to person or property, and to indemnify the Loverdes for all expense and damage, caused by Sewell's use of the premises. One source of such liability to third parties would be illegal unsanitary conditions on the premises, and it would be contradictory to hold that the Loverdes remained responsible for the "substantial" curative actions necessary to preclude or alleviate such conditions but that Sewell was to assume all risk of loss of, and to indemnify the Loverdes for any liability arising from, the Loverdes' breach of that duty.

Any doubt that might persist that Sewell assumed the risk of conforming the sewer system to the governmental requirements is dispelled by a consideration of the character of the premises involved. The primary use of the premises was for a trailer park, the principal features of which are the ground space and pads upon which the trailers rest, and the water,

or non-structural in nature, (5) the degree to which the lessee's enjoyment of the premises will be interfered with while the curative action is being undertaken, and (6) [in cases involving compliance with laws or orders] the likelihood that the parties contemplated the application of the particular law or order involved.

[11]See text accompanying footnotes 3 and 4, *infra*.

utility, and sewer facilities to which the trailers connect. Accordingly, one who intends to operate a trailer park must know that laws respecting and regulating such facilities would be of primary importance to him and would be those most obviously included in a clause requiring compliance with all applicable laws.

Sewell knew that adequate sewage disposal was essential, and he testified that he assumed that the sewer system was not connected to the public sewer. He knew or should have known that cesspool systems do not last forever and that when the septic system failed public sewer connections would be required.[12] He took the premises "as is," relieved the Loverdes of the duty to repair or maintain the improvements, agreed to indemnify them for any liability arising out of his use of the premises, and assumed the duty of compliance with all laws respecting the premises. ■ Under all the circumstances Sewell's covenant to comply included the obligation either to connect the sewer system to a public sewer or to cease using the premises as a trailer park. Accordingly, he assumed the risk that such compliance might interfere with his use of the premises or render it less profitable.

Having voluntarily assumed this duty and its attendant risk, Sewell may not avail himself of either the common law doctrine of frustration, or the doctrine relating to the destruction of the subject matter of a hiring as codified in Civil Code section 1932, subdivision 2.

■ "It is settled that if parties have contracted with reference [to the frustrating event] or have contemplated the risks arising from it, they may not invoke the doctrine of frustration to escape their obligations." (*Lloyd* v. *Murphy* (1944) 25 Cal.2d 48, 55 [153 P.2d 47]; see *Gold* v. *Salem Lutheran Home Assn.* (1959) 53 Cal.2d 289, 291 [1 Cal.Rptr. 343, 347 P.2d 687].)[13] The foregoing principle is not limited

[12]The laws here involved had been in effect long before this sublease was made. (See fn. 2 *infra.*) Parties to an agreement are presumed to have contemplated the laws and ordinances relating to the agreement. (*Brown* v. *Kling* (1894) 101 Cal. 295, 299 [35 P. 995]; *Monson* v. *Fischer* (1931) 118 Cal.App. 503, 516 [5 P.2d 628].)

[13]The doctrine of frustration as applied by courts in the United States originated in England at the turn of the century. (*Krell* v. *Henry* [1903] 2 K.B. 740 [C.A.]; *Blakely* v. *Muller,* 19 T.L.R. 186 [K.B.].) It is the most broadly stated of the discharge of duty doctrines and may, in consequence, appear to overlap other such doctrines: e.g., "Impossibility of Performance" (Civ. Code, § 1511; see 6 Williston, Contracts, § 1935, pp. 5418-5420; *Lloyd* v. *Murphy, supra;* Rest., Contracts, ch. 14, pp. 843-889); "Mistake" (Civ. Code, § 1689; *Bank Line Ltd.* v. *Arthur Chapel*

to the doctrine of frustration. (See e.g., *McLarren* v. *Spalding* (1852) 2 Cal. 510, 514.) It applies also to subdivision 2 of section 1932 of the Civil Code.[14] Whether the perishment required by section 1932 was the failure of the cesspool or the consequent termination of the trailer park operations pursuant

---

*& Co.* [1919] A.C. 435, 444-445; ''Destruction of Subject Matter'' (Civ. Code, §§ 1932, 1933, discussed *infra*.) It is, however, a separate doctrine. Despite the broad spectrum of rationales for and parameters of the frustration doctrine that have been utilized or proposed, the rule quoted above from *Lloyd* v. *Murphy* applies to all such combinations. (See, the surveys of ''frustration'' doctrines contained in Smit, *Frustration of Contract: A Comparative Attempt at Consolidation* (1958) 58 Colum.L. Rev. 287 (civil law) and Note (1960) 59 Mich.L.Rev. 98 (common law); see also, Farnsworth, *Disputes Over Omission in Contracts* (1968) 68 Colum. L.Rev. 860; Annot. (1962) 84 A.L.R.2d 12; *20th Century Lites, Inc.* v. *Goodman* (1944) 64 Cal.App.2d Supp. 938, 944 [149 P.2d 88] [doctrine based on implied condition] and *Dorn* v. *Goetz* (1948) 85 Cal.App.2d 407, 411 [193 P.2d 121] [doctrine based on failure of consideration].) The rule applies whether or not the doctrine itself contains a specific requirement of nonforeseeability. (*Compare* Rest., Contracts, § 288 and comment b *with* U.C.C., § 2-615 and comment 1 [Com. Code, § 2615]; see *20th Century Lites, Inc.* v. *Goodman, supra.*) The soundness of this conclusion is apparent when it is realized that the question whether a risk was foreseeable is quite distinct from the question whether it was contemplated by the parties. It is possible for the parties to contemplate and make express provision for, a risk that would not otherwise be considered foreseeable. Conversely, some risks may be so wholly foreseeable that it would strain credulity to believe that they were not contemplated by the parties. (See *Lloyd* v. *Murphy, supra.*) Finally, the parties may have contemplated and expressly provided for a type of risk that in fact occurs, but the magnitude or duration of which is so great that it cannot fairly be said to have been either contemplated or foreseeable. (See, Annot. (1942) 137 A.L.R. 1199, 1239-1255 and cases cited.) When a risk has been contemplated and voluntarily assumed, however, and the manner of its occurrence is not so extraordinary as to justify the invocation of the last stated rule, foreseeability is not an issue and the parties will be held to the bargain they made.

[14]Section 1932 provides: ''The hirer of a thing may terminate the hiring before the end of the term agreed upon: . . . . . 2. When the greater part of the thing hired, or that part which was and which the letter had at the time of the hiring reason to believe was the material inducement to the hirer to enter into the contract, perishes from any other cause than the want of ordinary care of the hirer.''

Although section 1932, subdivision 2 apparently codifies the civil law doctrine regarding the destruction of the subject matter of a contract (see the annotations of Messrs. Haymond and Burch, members of the California Code Commission, to § 1932, Civ. Code of 1872, citing Edwards, Bailments pp. 331-338 and Story, Bailments, §§ 418-420 which discuss the civil law), a similar doctrine had earlier developed in this state as a principle of common law. (*Ainsworth* v. *Ritt* (1869) 38 Cal. 89, 90.) Although the doctrine of frustration might, in the absence of section 1932, apply to situations covered by that section, the section neither limits the frustration doctrine nor codifies its principles. The two doctrines are distinguished in 6 Corbin, Contracts (rev. ed. 1938) sections 1334-1342 and 1353-1361; 6 Williston, Contracts (rev. ed. 1938) section 1935, subdivisions (3) and (5).

to governmental order, Sewell cannot prevail, for he assumed the risk of both occurrences. ■ Both before (*Ainsworth* v. *Ritt, supra,* 38 Cal. 89, 90) and after (*Egan* v. *Dodd* (1917) 32 Cal.App. 706, 710-711 [164 P. 17], cf. *Realty & Rebuilding Co.* v. *Rea, supra,* 184 Cal. 565, 574-576) the enactment of section 1932, it was recognized that a party could not terminate a lease because of the destruction of the subject matter when he had assumed the risk of such destruction by his covenants to repair since to do so would be to evade one of the essential elements of the risk allocation intended by the parties' agreement. The result must be the same when the lessee has assumed the risk involved by his covenants relieving his lessor of all duties of repair and maintenance and undertaking for himself the duty to comply with all laws and orders respecting the premises.

The judgment is affirmed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.