**ROBBERSON STEEL, INC., Appellant,**

v.

**J. D. ABRAMS, INC., et al., Appellees.**

**No. 6770.**

Court of Civil Appeals of Texas, El Paso.

May 16, 1979.

Rehearing Denied June 13, 1979.

Pearson, Caballero & Warach, Ray Pearson, El Paso, H. J. "Doc" Blanchard, Austin, for appellant.

Johnson & Bowen, Phillip C. Bowen, El Paso, for appellees.

## OPINION

OSBORN, Justice.

This case arises out of a breach of contract between a steel fabricator and a construction company who had contracted to build four bridges for the State of Texas. The trial Court found for the steel fabricator as to the amount due for steel furnished but unpaid for and provided for recovery of attorney's fees as found by the jury, but the Court allowed the construction company an offset for the amount of its damages as found by the jury to have resulted from the delay in delivery of the steel for the bridges. We affirm.

J. D. Abrams, Inc. (contractor) sued Robberson Steel, Inc. (fabricator) for damages resulting from a timely failure to furnish structural steel for four bridges being constructed for the Texas Highway Department in El Paso County, Texas. After Abrams became the successful bidder on this project it entered into a written contract with Robberson to furnish the necessary structural steel at various dates for a certain price per unit of steel. Overall the contract price was $1,347,214.33. The purchase order issued by Abrams to Robberson is dated 4–8–74 and it sets forth the shipping dates for the four different structures to be completed. Paragraph 8 of the General Conditions of the purchase order states "Delivery of materials will be in accordance with the construction schedule established by J. D. Abrams, Inc. Time is the essence of this Contract * * *."

Robberson was unable to obtain steel from the steel mills and was approximately six months late in delivering some of the fabricated steel to Abrams. That delay resulted in this suit. Robberson claimed the delay was excused under Section 2.615, Tex. Bus. & Comm.Code. It also pled waiver as a defense. Robberson filed a cross-action against Abrams and Argonaut Insurance Company, the surety on its payment bond, for the balance due on the purchase price of steel delivered, plus interest and attorney's fees. The trial Court found the amount owed by Abrams to Robberson to be $204,-990.58 and did not submit any issue to the

jury on that claim. There is no complaint about that finding.

In answer to Special Issue No. 1, the jury found Abrams' damages from the delay in delivery of steel to be $127,250.00. The next four issues about which there is substantial dispute are as follows:

"SPECIAL ISSUE NO. 2

"Was the delay in the delivery of the fabricated steel by the defendant the result of the Steel Mills' inability to furnish the steel to the Defendant?

"ANSWER 'YES' OR 'NO'.

"ANSWER: YES

"If you have answered the following Special Issue 'Yes', then but not otherwise, answer the following Special Issue."

"SPECIAL ISSUE NO. 3

"Was such inability on the part of the Steel Mills to furnish the steel to the Defendant, if you have so found, a contingency the non-occurrence of which was a basic assumption of the parties on which the contract (Plaintiff's Exhibit-22A, B, C) was made?

"ANSWER 'YES' OR 'NO'

"ANSWER: YES

"If you have answered the foregoing Special Issue 'Yes', then but not otherwise, answer the following Special Issue."

"SPECIAL ISSUE NO. 4

"Did the Defendant, Robberson Steel, Inc. seasonably notify the Plaintiff, J. D. Abrams, Inc. of the delay in delivery?

"ANSWER 'YES' OR 'NO'

"ANSWER: YES

"If you have answered the foregoing Special Issue 'Yes', then but not otherwise, answer the following Special Issue."

"SPECIAL ISSUE NO. 5

"Did the Defendant, Robberson Steel, Inc. allocate the steel it received from the Steel Mills among its customers in a fair and reasonable manner?

"ANSWER 'YES' OR 'NO'

"ANSWER: YES"

In addition, the jury failed to find a waiver of timely delivery as required by the purchase order, found Robberson gave written notice by certified mail of nonpayment of its claim to Abrams and Argonaut, and found Robberson's attorney's fees for prosecuting its claim to be $7,200.00.

After the verdict was received various motions for judgment were filed by the parties. The trial Court entered judgment based upon its finding that Abrams and Argonaut were indebted to Robberson for steel delivered and unpaid for in the amount of $204,990.58, plus the sum of $7,200.00 for attorney's fees, and interest on such sums from the date of the verdict on July 6, 1977, less the offset of $127,250.00 as damages for delay in delivery of steel. In entering such judgment the trial Court found "1. Robberson Steel, Inc., considered the availability of steel prior to entering into the contract; and 2. Robberson Steel, Inc., assumed the risk of non-availability of steel under the contract; and 3. By the contract terms, Robberson Steel, Inc., assumed the obligation to deliver steel in strict accordance with the schedule in the contract;" and granted Abrams' motion for judgment non obstante veredicto and motions for judgment on the basis of the verdict and findings of the Court on unsubmitted issues. The net effect of the judgment was that the trial Court made findings on certain controlling issues as to the defense of delay in delivery of steel under Section 2.615, Tex.Bus. & Comm.Code, and set aside certain jury findings on those issues.

By the first four points of error Robberson complains of the trial Court's disregarding the jury's answers to Special Issues Nos. 2 through 5 and entering judgment notwithstanding those findings. Points of Error Nos. 5, 6 and 7 complain about the trial Court making findings on unsubmitted issues which form the basis for the trial Court's judgment.

The controlling provision in Section 2.615, Tex.Bus. & Comm.Code, provides that "Delay in delivery * * * by a seller * * is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made * * *." In *United*

*States v. Wegematic Corporation,* 360 F.2d 674 (2d Cir. 1966) the Court said this "test seems a somewhat complicated way of putting Professor Corbin's question of how much risk the promisor assumed. Recent Developments in the Law of Contracts, 50 Harv.L.Rev. 449, 465–66 (1937); 2 Corbin, Contracts § 1333, at 371." In *West Los Angeles Institute for Cancer Research v. Mayer,* 366 F.2d 220 (9th Cir. 1966), the Court in considering the test to be applied with regard to impossibility in the performance of a contract said:

"The ultimate question in every case is 'whether or not proper interpretation of the contract shows that the risk of the subsequent events, whether or not foreseen, was assumed by the promisor. If it appears from the nature of the contract as well as from the surrounding circumstances that, although they were reasonably foreseeable, the promisor did not assume the risk of the subsequent events, the contract shows a gap subject to supplementation in accordance with rules of objective law. Conversely, if the contract, properly construed, shows that the promisor assumed the risk of unanticipated events, the occurrence of such events does not excuse performance.' Smit, 58 Colum.L.Rev. 287, 314 (1958). See also *L. N. Jackson & Co. v. Royal Norwegian Gov't,* 177 F.2d 694, 699 (2d Cir. 1949); 6 Williston, Contracts § 1953, pp. 5475– 5476; Restatement, Contracts §§ 288, 461."

The evidence reflects that a representative of Robberson first contacted Abrams about supplying the fabricated steel for the four bridge structures at the time of the bid letting in March, 1974. After Abrams received the contract from the State, Mr. Miles Hart, General Manager and Vice-President of Robberson, came to El Paso in April seeking the steel fabrication work on this job. On April 5, 1974, a firm price of $41.60 per cwt was agreed upon. The purchase order was issued on April 8, 1974, approved by Miles Hart on April 10, 1974, and executed by Robberson officers in May, 1974. But prior to executing the contract Robberson checked with their suppliers to

determine that the mills could supply their needs. Richard Taylor, Purchasing Manager for Robberson, testified that two or three weeks before the bid letting by the State he obtained a confirmation through Armco Steel Corporation and U.S. Steel that the steel required on this job would be available. This is a customary procedure for him in the business. He then testified as to the next step in the process as follows:

"Q. What if anything, happened after your confirmation?

A. I was advised after the letting that we were successful in getting the job.

Q. What did you do, if anything, thereafter?

A. I reconfirmed with the mills that the scheduled delivery was still on time.

Q. Was there any concern, when was this, what date approximately was this?

A. Approximately April 15, through the 20th.

Q. Was there any concern after the first confirmation that there would be, the schedules would not be met?

A. No, there was not.

Q. I will ask you, whether or not, when you say you reconfirmed is that through purchase orders?

A. Yes, sir."

Both Mr. Larwig, Executive Vice-President of Robberson, and Mr. Hart also testified to the fact that Robberson had checked on delivery and received a confirmation from the rolling mills before this contract was signed.

The evidence also established that the mill at Armco Steel Corporation with whom Robberson had placed its order, broke down, and Robberson could not get delivery as expected and therefore it was six months late in some shipments to Abrams. There was substantial evidence as to the expense and cost to the contractor in being six months longer than originally planned in completing the project.

As noted by the evidence set forth above, Robberson was concerned about delivery before it entered into the contract with Abrams. It was a contingency about which it reconfirmed with the mills before signing the purchase order which had specific dates for delivery and provided that "Time is the essence of this Contract * * *." The evidence quoted above clearly shows that delivery from the supplier to the fabricator was very definitely a circumstance within the contemplation of the parties at the time the contract was made.

In *Nora Springs Cooperative Company v. Brandau,* 247 N.W.2d 744 (Iowa 1976), the Court said "[O]rdinarily a contingency which reasonably may have been anticipated must be provided for by the terms of the contract, or else the impossibility of performance resulting therefrom does not operate as an excuse." The fact that this contingency was recognized is best illustrated by the bid sheet, dated March 22, 1974, which Robberson gave to the various contractors who bid this project. That bid sheet stated "Delivery is subject to our ability to procure steel from our steel mill suppliers." One of the conditions on the back of that bid sheet provided "Seller shall be excused for all delays in deliveries occasioned by * * * inability to secure suitable or sufficient material from customary sources * * *."

But after having checked with their sources of supply Robberson chose not to incorporate those provisions in the purchase order from Abrams and agreed to bind itself to deliver materials in accordance with the construction schedule set forth in the purchase order, with no condition based upon availability of steel from the mills.

One of the major problems in interpreting Section 2.615 of the Code has been with regard to the issue of "foreseeability". Comment No. 1 under the Section states "This section excuses a seller from timely delivery of goods contracted for, where his performance has become commercially impracticable because of unforeseen supervening circumstances not within the contemplation of the parties at the time of con-

tracting." One of the leading cases prior to adoption of the Code on the issue of impossibility of performance is *Lloyd v. Murphy,* 25 Cal.2d 48, 153 P.2d 47 (1944). Justice Traynor, writing for the Court in that case, said:

" * * * The purpose of a contract is to place the risks of performance upon the promisor, and the relation of the parties, terms of the contract, and circumstances surrounding its formation must be examined to determine whether it can be fairly inferred that the risk of the event that has supervened to cause the alleged frustration was not reasonably foreseeable. If it was foreseeable there should have been provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed."

In Murray on Contracts (2d rev. ed. 1974), the author comments in Sections 202 and 204 upon the holding in the *Lloyd* case and the code provision with regard to the issue of foreseeability as follows:

"It is important to consider the operative circumstances which the case law manifests as particularly important. In the well-known case of *Lloyd v. Murphy,* [10] the court emphasized the fact that the frustrating event was foreseeable. Moreover, the fact of foreseeability suggests that if the risk was not assumed, some provision in the contract would normally manifest that intention. Finally, the value or purpose of the contract was not entirely destroyed though it may have been substantially restricted. While there are other cases insisting upon the lack of foreseeability as the *sine qua non* of the frustration defense to excuse nonperformance,[11] it is now clear that the fact that the parties did foresee the frustrating event does not, alone, bar the use of the defense if the evidence indicates that the parties entered into the contract on the assumption that the foreseeable risk would not occur.[12] Foreseeability is still a factor. However, the critical question remains: did the parties contract on a basic assumption that a particular con-

tingency would not occur?[13] If they did, the risk of that contingency was not assumed and, assuming the occurrence of the contingency destroys the purpose of the contract, nonperformance after the frustrating event should be excused.

\*    \*    \*    \*    \*    \*

"Another problem found in the basic 'impossibility' section of the Code is the use, in a comment, of the term, 'unforeseen'.[50] As suggested in earlier sections, [51] it is becoming more clear that the "unforeseeability" of the contingency is not a *sine qua non* to excuse the nonperforming party though it is always a factor to be considered in risk allocation. Courts have taken this position while expressly recognizing the contrary Code language.[52] \*    \*    \*"

In *Eastern Airlines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957 (5th Cir. 1976), the Court discussed at some length the foreseeability issue and said:

" \*    \*    \* The rationale for the doctrine of impracticability is that the circumstance causing the breach has made performance so vitally different from what was anticipated that the contract cannot reasonably be thought to govern. 6 S. Williston, Contracts § 1963 at 5511 (rev. ed. 1938). However, because the purpose of a contract is to place the reasonable risk of performance on the promisor, he is presumed, in the absence of evidence to the contrary, to have agreed to bear any loss occasioned by an event which was foreseeable at the time of contracting. *Lloyd v. Murphy,* 1944, 25 Cal.2d 48, 54, 153 P.2d 47, 50 (Traynor, J.); see *Madeirense Do Brasil S. A. v. Stulman-Emrick Lumber Co.,* 2 Cir. 1945, 147 F.2d 399, 403; *McCulloch v. Liguori,* 1948, 88 Cal.App.2d 366, 373, 199 P.2d 25, 30. Underlying this presumption is the view that a promisor can protect himself against foreseeable events by means of an express provision in the agreement.

"Therefore, when the promisor has anticipated a particular event by specifically providing for it in a contract, he should be relieved of liability for the occurrence of such event regardless of whether it was foreseeable.[97] See *Edward Maurer Co. v. Tubeless Tire Co.,* 6 Cir. 1922, 285 F. 713, 714–715. As Justice Traynor noted for the California Supreme Court under different but nonetheless analogous circumstances,

'the question whether a risk was foreseeable is quite distinct from the question whether it was contemplated by the parties.  .  .  .  When a risk has been contemplated and voluntarily assumed  .  .  .  foreseeability is not an issue and the parties will be held to the bargain they made.'

"*Glenn R. Sewell Sheet Metal, Inc. v. Loverde,* 1969, 70 Cal.2d 666, [75 Cal.Rptr. 889], 451 P.2d 721, 728 n. 13; see *Lloyd v. Murphy,* supra [25 Cal.at at 54], 153 P.2d at 50. \*    \*    \*"

The issue of an excuse of impossibility of performance of a contract under Section 2.615 of the Uniform Commercial Code was before the Massachusetts Supreme Court for the first time in *Mishara Construction Company, Inc. v. Transit-Mixed Concrete Corp.,* 310 N.E.2d 363 (1974). In discussing the issue of foreseeability and the rationale behind risk allocation under a contract the Court said:

" \*    \*    \* The important question is whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract. If so, the risk should not fairly be thrown upon the promisor." Williston, Contracts (Rev. ed.) § 1931 (1938). The emphasis in contracts governed by the Uniform Commercial Code is on the commercial context in which the agreement was made. The question is, given the commercial circumstances in which the parties dealt: Was the contingency which developed one which the parties could reasonably be thought to have foreseen as a real possibility which could affect performance? Was it one of that variety of risks which the parties were tacitly assigning to the promisor by

their failure to provide for it explicitly? If it were, performance will be required. If it could not be so considered, performance is excused. * * * "

In the comment in 14 Duquesne Law Review 235 (1976), entitled "Contractual Excuse Based On a Failure of Presupposed Conditions," the author at 238 states:

" * * * Excuse under this clause should be found only if the following three questions can be answered affirmatively:

(1) Has a contingency occurred?

(2) Was its non-occurrence a basic assumption upon which the contract was made?

(3) Has the contingency rendered the agreed performance impracticable? * * * "

Clearly under the evidence in this case the first and third questions must be answered in the affirmative, but just as clearly the second question must be answered with a "no". The evidence established that the contingency which developed was one which the parties could reasonably have foreseen and it was one of that variety of risks which the parties tacitly assigned to the promisor by their failure to provide for it explicitly. While we hold that there is evidence to support the jury's answers to Special Issues Nos. 2, 4 and 5, there is no evidence to support the answer to Special Issue No. 3. As noted in the Duquesne Law Review Comment, that is a critical issue to the defense presented. Thus we conclude that the trial Court properly disregarded the answer to Special Issue No. 3 and correctly entered judgment without regard to the alleged defense under Section 2.615, Tex.Bus. & Comm.Code. Since the issues under this defense should not have been presented to the jury, the answers became immaterial and the trial Court was authorized under Rule 301, Tex.R.Civ.P., to disregard the answer to those issues. *C. & R. Transport, Inc. v. Campbell,* 406 S.W.2d 191 (Tex.1966); *Grubb v. Grubb,* 525 S.W.2d 38 (Tex.Civ.App.—El Paso 1975, writ ref'd n. r. e.). Points of Error Nos. 1 through 4 are overruled.

It is asserted in the second series of points that Abrams waived any ground of recovery on its claim because of the provision of Rule 279, Tex.R.Civ.P. It is asserted that the three findings made by the trial Court are not referable to other issues submitted and therefore they cannot form the basis for a ground of recovery. In this case, there is no question but that Robberson breached its contract to deliver steel at specified times. Having concluded that Robberson had no defense for late delivery the cause of action was established as a matter of law and there was no waiver for failure to request or obtain other findings. *Moughon v. Wolf,* 576 S.W.2d 603 (Tex. 1978). The only element for the fact finder was the unliquidated damages. That issue was presented to the jury in Special Issue No. 1. Thus, Abrams was entitled to recover, as an offset, its damages resulting from the delay in delivery of fabricated steel. The three findings made by the trial Court add nothing, except that the Court concludes that under the undisputed evidence the reverse of the issue presented by Special Issue No. 3 has been established as a matter of law. If it makes any difference, the proof having come from Robberson's agents does establish as a matter of law that Robberson did consider the availability of steel prior to entering into the contract and Finding No. 1 is proper. The second and third findings are actually conclusions of the Court resulting from the first finding. Points of Error Nos. 5, 6 and 7 are overruled.

Points of Error Nos. 8 and 9 assert that the trial Court erred in entering judgment non obstante veredicto for Argonaut Insurance Company and in disregarding the answers to Special Issues Nos. 2 through 5, because Argonaut did not file a motion for such relief. The contention that Argonaut did not file motions seeking such relief is correct. But Argonaut is liable under its payment bond only for sums owed and unpaid by Abrams. Thus, the offset which was obtained by Abrams necessarily accrued to Argonaut when final judgment was entered for the net amount owed by

Abrams to Robberson. To hold otherwise would allow Robberson a double recovery. Points of Error Nos. 8 and 9 are overruled.

The last two points assert error in failing to grant prejudgment interest and in failing to enter judgment for interest on the full amount owed by Abrams to Robberson without regard to any offset. On January 8, 1976, Abrams wrote Robberson saying "We have your final billing in the amount of $204,990.58." The letter does not dispute that amount as being the correct amount of the account. That was the amount the trial Court found to be due and owing, although a subsequent statement did claim an additional sum of $644.49. In the January letter Abrams claimed an offset of $95,556.00 and tendered payment of $109,434.58.

Article 5069–1.03, Tex.Rev.Civ. Stat.Ann., provides "When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all written contracts ascertaining the sum payable, from and after the time when the sum is due and payable; * * *." The fact that the amount of Robberson's recovery could not be ascertained until after a trial of the cause does not affect its right to interest on the amount of its claim from the date the amount was acknowledged, subject to any offset, or counterclaim which might have been established. *Beck v. Lawler,* 422 S.W.2d 816 (Tex.Civ.App.—Fort Worth 1967, writ ref'd n. r. e.). In this case, after allowing the offset as found by the jury, the amount owed by Abrams to Robberson was $77,740.58. The amount tendered by Abrams with its letter of January 8, 1976, was substantially above the amount actually due and owing. Thus the tender was such as to prevent any interest from accruing on the account. 33 Tex.Jur.2d Venue, Interest, § 6 (1962). Therefore, we overrule Points of Error Nos. 10 and 11.

We have considered the appellee's Cross-Points Nos. 1 through 4, and they are all overruled.

The judgment of the trial Court is affirmed.