Filed 2/29/24  Culver City Mall v. Shanghai No. 1 Seafood Village CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| CULVER CITY MALL LLC et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>SHANGHAI NO. 1 SEAFOOD VILLAGE, INC., et al.,<br><br>Defendants and Appellants. | B322183<br><br>(Los Angeles County<br>Super. Ct. No. 21STCV16837) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael L. Stern, Judge.  Affirmed.

———————

P&N Law Firm, Ruben R. Newell and Pooja Patel for Defendants and Appellants.

Ballard Spahr, Brian D. Huben and Nahal Zarnighian for Plaintiffs and Respondents.

Shanghai No. 1 Seafood Village, Inc. (Shanghai) and Eric Qian (Qian) appeal from a judgment against them in a breach of lease and guarantee lawsuit by Shanghai's former landlords, Culver City Mall LLC (Culver City Mall) and Valencia Town Center Venture, L.P. (Valencia Mall) (collectively, the Malls). At trial, Shanghai and Qian argued that governmental restrictions on dine-in restaurants during the COVID-19 pandemic excused their obligations to pay rent. Their only challenge is to the sufficiency of the evidence to support the trial court's findings in rejecting the pandemic-related affirmative defenses. As discussed below, we conclude that regardless of governmental restrictions or the challenged factual findings, the leases obligated the restaurants to pay rent. We affirm.

## FACTUAL BACKGROUND

Shanghai entered into two virtually identical leases (collectively, the leases) with the Malls. Qian personally guaranteed the lease with Valencia Mall. The leases required that Shanghai use the leased spaces solely for "the operation of an Azabu Sabo [the trade name for the restaurant listed in the agreements] Japanese restaurant."

The leases contain force majeure clauses addressing the possibility that either party is "delayed in the performance of its initial construction, or maintenance and/or repair obligations, by reasons of[, inter alia,] . . . Acts of God . . . restrictive governmental laws or controls; [or] judicial orders." These clauses permit such delayed performance to "be excused for the period of the delay . . . provided, however, that the time for performance shall in no event be extended due to[, inter alia,] financial or economic problems of either party." The force majeure clauses impose notice requirements as "a condition of [Shanghai]'s right to claim

an extension of time as a result [of a force majeure event]." These clauses further provide: "*Notwithstanding anything to the contrary, the occurrence of any of the events of force majeure herein described shall not excuse [Shanghai]'s obligations to pay minimum annual rental, percentage rental and additional rent*[1] . . . *or excuse such obligations as this lease may otherwise impose on the party to obey, remedy or avoid such event*." (Capitalization omitted & italics added.)

Beginning in January 2020, Shanghai failed to pay any rent and Qian paid nothing to Valencia Mall under the guaranty. The Malls filed a breach of lease and breach of guaranty complaint against Shanghai and Qian.

Following a bench trial, the court issued a judgment in favor of the Malls. In its written judgment, the trial court rejected Shanghai and Qian's affirmative "defenses of frustration of purpose, excuse of performance, impossibility or force majeure based on their inability to operate restaurants and pay rent . . . due to the shutdowns of their business locations due to the Covid pandemic." As to frustration of purpose, the judgment provided that the "value of [the] lease" had not been "destroyed by a governmental order." The court noted Shanghai's restaurants "had some 'inside' dining capacity, but were take-out or take-and-carry food establishments where customers would order and take their food with them while shopping at the mall locations." The court acknowledged the possibility that Shanghai "could no longer sell food to the public due to mall inaccessibility or foot trade restrictions due to governmental

---

[1] The leases include exceptions to this provision for situations involving the partial or total destruction of the premises or a taking of the premises under the power of eminent domain. Shanghai and Qian do not argue that these exceptions apply.

3

Covid regulations followed by [the Malls] that limited access to customers." It noted, however, that Shanghai and Qian had "presented no evidence that they contacted [the Malls], at any level, or made attempts or requests for permission to modify their business practices to allow continued and adapted food sales or sought to negotiate rent modifications or abatements." Nor had they presented any evidence "showing that it was more likely than not that they attempted to operate a functioning business."

As to impossibility, the court further noted that the leases' force majeure clauses contemplate situations in which performance becomes either impossible or valueless, and that Shanghai and Qian had not established any right to relief under the terms of those clauses.

This appeal followed.

## DISCUSSION

On appeal, Shanghai and Qian argue that the trial court erred in rejecting their affirmative defenses, because the court premised this rejection on a finding that is not supported by substantial evidence: namely, that Shanghai's restaurants "were take-out or take-and-carry food establishments" and thus capable of operating despite pandemic-related governmental restrictions. They describe Shanghai's restaurants as "serving hot pot, Japanese food known as Shabu-Shabu," which is necessarily a dine-in experience in that "the food is served uncooked at the table and the patrons put the food into a bowl of hot broth to let it cook at the table." They point to uncontradicted testimony, including testimony from the Malls' witnesses, that the express purpose of the leases was to operate dine-in Shabu-Shabu restaurants. Their sole argument on appeal is that, because of the court's unsupported

4

factual finding about the nature of the restaurants, the court reversibly erred in rejecting their COVID-19 affirmative defenses.

Whether or not the court correctly found that Shanghai could offer take out at the leased spaces, and whether or not the purpose of the leases was to operate exclusively dine-in restaurants, Shanghai and Qian still have not established reversible error. We briefly analyze each defense below, and for the purposes of these analyses, we assume that the restaurants were dine-in only and that the purpose of the leases was to operate such dine-in only restaurants.[2]

As to impossibility, Shanghai and Qian argue COVID-19 pandemic government closure orders made it illegal for Shanghai to operate a dine-in restaurant. But Shanghai's obligation under the lease was to pay rent, and government closure orders did not make it illegal for Shanghai to pay rent.

---

[2] As to whether the lease permitted Shanghai to operate a take-out restaurant at the leased spaces, we note that the "permitted use[s]" (capitalization omitted) section of the leases provides that Shanghai "shall use the premises only for the purpose of conducting the business specifically set forth in the data sheet and for no other purpose." (Capitalization omitted.) The portion of the leases titled "data sheet" provides that the "premises shall be used for the operation of an Azabu Sabo [the trade name for the restaurant listed in the agreements] Japanese restaurant preparing and serving the following traditional Japanese menu items as its primary offerings: Katsu dishes (pork) and curry dishes, Japanese noodle dishes such as ramen, and udon and similar dishes, Japanese confections and deserts plus a variety of coffee and tea drinks . . . prepared and served on [the] premises. . . . The premises shall be used solely for the use stated above and for no other use or purpose." (Capitalization omitted.)

As to the affirmative defense of excused nonperformance, Shanghai and Qian cite Civil Code section 1151, which can excuse "[t]he want of performance of an obligation . . . [¶] . . . [¶] . . . [w]hen it is prevented or delayed by an irresistible, superhuman cause." Even if the pandemic had prevented Shanghai from fulfilling its obligations to pay rent under the leases, Civil Code section 1151 expressly states it does not excuse performance when, as here, "the parties have expressly agreed to the contrary." (Civ. Code, § 1511, subd. (2).) Specifically, the parties agreed that "the occurrence of any of the events of force majeure herein described"—including "restrictive governmental laws or controls [or] judicial orders" or "Acts of God"—"shall not excuse [Shanghai]'s obligations to pay [rent due under the leases]."

Shanghai and Qian argue that this language cannot prevent their frustration of purpose defense, because it appears in a force majeure clause that "only applied to initial construction [obligations]." (Boldface omitted.) Specifically, they point to the first clause in the first sentence of that provision: "*In the event either party . . . shall be delayed in the performance of its initial construction, or maintenance and/or repair obligations*, by reasons of [various force majeure events] . . . then performance of such act shall be excused for the period of the delay." (Italics added.) Shanghai and Qian contend, with no further analysis, that this " 'plain language' " shows the inapplicability of the force majeure clause because initial construction on both locations had concluded before the pandemic began. They fail, however, to read this first clause in the context of the entire force majeure provision.

The first clause of the force majeure provision excuses delays in performing initial construction, maintenance and/or repair obligations—it does not speak to the obligation to pay rent under the lease. Another portion of the force majeure clause does

6

speak to the payment of rent, however, and provides—without limitation—that it will never be excused by an act of force majeure: "Notwithstanding anything to the contrary, the occurrence of any of the events of force majeure herein described shall not excuse [Shanghai]'s obligations to pay minimum annual rental, percentage rental and additional rent . . . or excuse such obligations as this lease may otherwise impose on the party to obey, remedy or avoid such event." (Capitalization omitted.) Thus, although some terms of the force majeure clause address only situations involving certain construction, repair, and maintenance obligations, those terms are inapplicable here. The term in the clause that is applicable—the term addressing the payment of rent—reflects an agreement that Shanghai would continue to pay rent, even in the face of force majeure events.

The force majeure clauses likewise preclude the frustration of purpose affirmative defense. The doctrine of frustration excuses contractual obligations where " '[p]erformance remains entirely possible, but the whole value of the performance to one of the parties at least, and the basic reason recognized as such by *both* parties, for entering into the contract has been destroyed by a supervening and unforeseen event.' " (*Dorn v. Goetz* (1948) 85 Cal.App.2d 407, 410.) However, " '[i]t is settled that if the parties have contracted with reference [to the frustrating event] or have contemplated the risks arising from it, they may not invoke the doctrine of frustration to escape their obligations.' [Citations.]" (*Glenn R. Sewell Sheet Metal, Inc. v. Loverde* (1969) 70 Cal.2d 666, 676.) Here, the leases expressly address a situation where "restrictive governmental laws or controls" or "Acts of God" prevent or delay performance and provide that such events do not relieve Shanghai of its obligation to pay rent.

7

Thus, regardless of whether or not substantial evidence supports the court's finding regarding the nature of the restaurant Shanghai planned to or was permitted to operate on the leased premises, and regardless of whether or not the purpose of the lease was to operate an exclusively dine-in restaurant, the court did not err in rejecting their COVID-19 pandemic-related affirmative defenses.

## DISPOSITION

We affirm the judgment.  Respondents are awarded their costs on appeal.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:



BENDIX, J.



WEINGART, J.

8