[No. B059119. Second Dist., Div. Two. June 1, 1993.]

WERNER F. WOLFEN, as Trustee, etc., et al., Plaintiffs and
Respondents, v.
CLINICAL DATA, INC., Defendant and Appellant.

**COUNSEL**

Richard Garber for Defendant and Appellant.

Irell & Manella, Henry Shields, Jr., and Donna R. Hecht for Plaintiffs and Respondents.

**OPINION**

**BOREN, P. J.**—Following a trial without a jury, judgment was entered against defendant Clinical Data, Inc. (hereinafter, Clinical), for damages in the amount of $296,510.66. The damages reflected the total cost necessary to remedy various code violations which arose from structural changes made by Clinical's subtenant on a commercial lease of real property owned by Louis Glasier 1974 Revocable Trust et al. (hereinafter, collectively referred to as the Owners). Clinical alleges that the court (1) failed to allow, as a deduction from the damage award, a setoff for the value of certain improvements made to the property, (2) failed to apportion between Clinical and the Owners the cost of certain improvements and repairs, thereby unjustly

enriching the Owners, and (3) erred in admitting into evidence the Owners' itemized summary of damages. We find that the Owners had the right to the reversion of property, including all improvements and alterations, without a setoff at the end of the lease term, that the required repairs which had to be made to the property were properly apportioned, and that the Owners' damage summary was admissible pursuant to Evidence Code section 1509. The judgment is therefore affirmed.

### FACTS

In 1977, the Owners leased to Cardio-Dynamics Laboratories, Inc., the property in question, two commercial buildings at 12401 Olympic Boulevard in West Los Angeles, under a five-year lease providing for a monthly rent of $5,677. The lease also permitted the tenant to extend the lease for an additional five-year term, with the rent to be adjusted upward based on the cost-of-living index. In 1981, Clinical acquired Cardio-Dynamics and assumed the lease. Clinical used the property for offices and light manufacturing.

The lease provided the following as to maintenance of the premises: "Tenant shall, at its sole cost and expense, perform maintenance and repair to keep the premises in good and sanitary order, excepting reasonable wear and tear . . . . Tenant may at its option make improvements to the premises at its sole expense as may be required by the business conducted therein. Tenant shall not make any of the following changes without first obtaining Landlord's written consent . . . : (a) Structural changes. (b) Any change which will materially reduce the market value of the demised premises." As to use and occupancy, the lease provided, "Tenant shall have the right to use and occupy the demised premises for any lawful purpose." The lease further provided, "Tenant agrees to pay, and to protect, indemnify, defend and hold harmless Landlord from and against all liability, damages, and expenses from causes of action, suits, claims, demands and judgments of any nature whatever arising out of or in [any] way connected with Tenant's occupancy of the premises . . . ."

At the end of the initial five-year term of the lease, Clinical exercised the option to extend the lease for an additional five-year term with the rent during the option term set at $8,780 per month. Thereafter, Clinical decided not to continue to occupy the property itself, and in July of 1983, entered into a sublease with Discovery Broadcasting Systems, Inc. (hereinafter, Discovery) as the subtenant. Under the sublease, Clinical realized a substantial profit, as Discovery was obligated to pay rent of $19,218 per month with automatic 5 to 10 percent annual increases.

In a letter dated September 19, 1983, counsel for the Owners advised counsel for Clinical, "[M]y clients are not yet in a position to grant or withhold their consent" to the sublease of the premises because of certain concerns expressed about Discovery's fiscal responsibility and about whether "proposed improvements are in compliance with applicable codes and the terms of the master lease." The Owners noted also that Clinical had violated the master lease by commencing construction activities on the premises without seeking prior approval and advised Clinical that it would be "fully responsible for any liability of any type whatsoever resulting or arising from construction activities on the premises." Clinical responded by advising the Owners that there was no need for concern because consent was not required for cosmetic rather than structural changes on the premises and that the changes on the premises would "increase the value of the [p]roperty." The Owners replied by complaining about the lack of notice as to the nature of improvements made on the premises, expressing concern as to unspecified illegal activities occurring on the premises and requesting that Clinical indemnify the Owners "from any and all claims, losses, costs, etc. . . . arising out of or resulting from [Clinical's] subleasing of the premises." The Owners further complained that Clinical had improved the premises and allowed the subtenant to take possession before receiving the requisite consent from the Owners.

Clinical responded by forwarding to the Owners copies of the plans for the construction of the improvements to the premises and noting that the lease provides that the tenant may only use the premises for lawful purposes.[1] The Owners thereafter claimed they understood that Clinical "was going to stand for any damages from any illegal activities . . . conducted by Discovery on the property during the term of its sublease."

Approximately five years later, as both the lease and sublease were due to expire, the Owners evaluated the condition of the property and assessed the alterations which had occurred during the term of the sublease to Discovery. Discovery had converted the property from office and light manufacturing use into a television studio with sound stages and ancillary rooms. Various equipment was installed in both the front and back buildings of the property. However, all the major construction work that occurred during this transformation had been performed without the benefit of the required building

---

[1] Article 5 of the sublease provided, in pertinent part: "Tenant shall not cause or permit the Property to be used in any way which constitutes a violation of any law, ordinance, or governmental regulation or order, . . . and shall promptly take all substantial and non-substantial actions necessary to comply with applicable statutes, ordinances, rules, regulations, orders and requirements regulating the use by Tenant of the Property . . . ." The sublease also provided, "All alterations, additions, and improvements will be accomplished in a good and workmanlike manner [and] in conformity with all applicable laws and regulations . . . ."

permits. The construction failed to comply with various building code provisions either (1) because some of the work performed by Discovery failed to meet code standards, or (2) because the work which had been done triggered certain other code requirements which should have been but were not satisfied regarding, for example, fire safety and handicap accessibility. Moreover, the property had deteriorated in certain respects due to the absence of proper maintenance. Nonetheless, the basic alteration of the nature of the premises was beneficial to the Owners, who had located as a potential new tenant a radio station, KSCI, Inc. (hereinafter, KSCI).

According to the Owners' contractor, Discovery's conversion of the premises into studio facilities required that numerous conditions be repaired to comply with the requirements of the building code. The major construction and conversion of the nature of the premises during the sublease to Discovery required that the following work be done to comply with building code requirements: (1) alteration of the main corridor in one of the buildings to resist fire for one hour or, alternatively, that the building be fully sprinklered; (2) provision made for handicap accessibility; (3) certain electrical work redone in conformity with code requirements; (4) leaking roofs and clogged and punctured storm drains repaired; (5) an unmaintained air conditioner compressor repaired and air conditioning equipment altered to conform with code requirements; (6) demolition of the breezeway between the two buildings on the premises which had been roofed over and enclosed in violation of the code; (7) replacement of asphalt which either had not been maintained or was necessary to remove to effect other repairs, such as sprinkler installation and storm drain repair; (8) replacement of trees and other plants which had not been maintained; and (9) demolition of the interior construction of one of the buildings which had been done in violation of code requirements. A lack of proper maintenance also prompted general repairs, such as fixing leaking pipes, stained walls and ceilings, broken windows and repairing hardware. The Owners then contracted to have the repair work performed.

The trial court held Clinical liable for all repairs necessary to remedy building code violations which arose from the various alterations and purported improvements performed by Discovery during the term of the sublease. The court found, apparently based on the exchange of letters between the parties, that Clinical had "guaranteed . . . to the Landlord" that the sublease would comply "with applicable law" in making alterations and improvements. The court also refused to allow Clinical any setoff for the value of improvements because "[t]he lease provides for installation of improvements at Clinical['s] expense and improvements attached to the real property . . . passed to [the] landlord upon termination of the lease, unless

the parties have agreed . . . to their removal and restoration of the premises to its original state. In this case no such requirement exists in the lease." The trial court further deemed Clinical liable for all damages due to the breach of its covenant to maintain and repair the premises.

The trial court therefore awarded the entire amount sought for sprinkler installation, handicap access work, electrical work, roof and storm drain repair, the interior demolition of one of the buildings, and the breezeway demolition. However, the court deemed Clinical liable only for damages from code violations or lack of maintenance, but not for reasonable wear and tear. Accordingly, the court excluded from the award for air conditioning work the amount representing the replacement cost of a compressor, which had failed due to normal wear and tear, awarded costs for paving the front but not the rear of the property because the rear paving had already deteriorated when Clinical had moved in, awarded only part of the claimed costs for landscaping because of insufficient proof that tree removal was necessitated by a lack of maintenance, and as to miscellaneous general repairs, the court eliminated portions of those claims it deemed due to reasonable wear and tear. The trial court entered judgment for the Owners and against Clinical in the total amount of $296,510.66, and Clinical appeals.

## DISCUSSION

I. *The trial court properly refused to permit Clinical to set off the value of the structural changes it made on the premises against the damages it was assessed.*

■ Clinical contends that the trial court erred in failing to deduct from the award of damages the value of various improvements left by Discovery. The principal improvements claimed by Clinical were: Discovery's installation of air conditioning, a double-entry door lock, fluorescent lighting, the construction of two sound stages and a special sound wall, and other media-related alterations. These improvements, which essentially turned a light manufacturing and office facility into a cable broadcasting studio, apparently attracted the next tenant, KSCI, and were thus improvements which the Owners deemed valuable because they "had a tenant who was prepared to use them." Clinical thus urges that the value of the improvements left by its sublessee, Discovery, should not unjustly enrich the Owners and should have been subtracted from the damage award.

It is well settled, however, that unless there is an express covenant in the lease to the contrary, any improvements constructed on the leased premises are the property of the landlord at the end of the term of the lease. (*Gett* v.

*McManus* (1873) 47 Cal. 56; *Long* v. *Keller* (1980) 104 Cal.App.3d 312, 321 [163 Cal.Rptr. 532]; see 6 Miller & Starr, Current Law of Cal. Real Estate (2d ed. 1989) Landlord and Tenant § 18:107, pp. 287-289.) In the present case, the lease permitted the lessee to "make improvements to the premises at its sole expense." The terms of the lease further provided that the tenant must first obtain the landlord's consent before making either structural changes or any "change which will materially reduce the market [value] of the demised premises." The lease thus assumed that the value of the improvements would inure to the benefit of the landlord. ██ ██ Indeed, when Clinical sought the Owners' approval of the sublease to Discovery, Clinical urged that the Owners had no reason to object to the improvements then underway because such improvements would "increase the value of the [p]roperty."[2]

Clinical's reliance upon *Space Properties, Inc.* v. *Tool Research Co.* (1962) 203 Cal.App.2d 819 [22 Cal.Rptr. 166] is misplaced. In *Space Properties*, where the court refused to allow a breaching lessee a setoff for the value of improvements it had constructed, the court reasoned, "Although [the tenant] succeeded in showing that [the landlord] had in fact utilized these facilities and found them satisfactory, there was no evidence whatever [the landlord] was thereby financially benefited." (*Id.* at pp. 827-828.) The Owners assert the theory that they were not financially benefited beyond what they were entitled to receive as full performance under the lease. Apart from the Owners' theory, *Space Properties* is not controlling because it specifically held that the general principle of unjust enrichment was a rule of "no moment here." (*Id.* at p. 827.) Thus, while describing the tenant's asserted affirmative defense of setoff, the court in *Space Properties* did not rule upon the propriety of the legal principle because it was factually inapplicable.

Moreover, Clinical's claims of unjust enrichment appear somewhat disingenuous in view of the fact that the improvements for which setoffs are claimed were done not at Clinical's expense, but rather at the expense of the subtenant, Discovery. Clinical also charged Discovery over twice as much rent per month as Clinical was obligated to pay to the Owners under its own lease, thereby obtaining for Clinical a substantial monthly profit. Accordingly, Clinical is unable to establish a claim of unjust enrichment or setoff.

---

[2]We note that a tenant has a statutory right to remove a limited class of fixtures, known as trade fixtures, but that right exists only "during the continuance of his term." (Civ. Code, § 1019.) Once the term of the lease ends and the tenant surrenders the premises, trade fixtures not previously removed are deemed abandoned and become the property of the landlord. (*Rinaldi* v. *Goller* (1957) 48 Cal.2d 276, 282 [309 P.2d 451].)

II. *The court properly held Clinical liable for expenses incurred by the Owners in repairing damage to the premises and in making modifications to satisfy code requirements prompted by Discovery's structural improvements.*

The Supreme Court's opinion in *Glenn R. Sewell Sheet Metal, Inc.* v. *Loverde* (1969) 70 Cal.2d 666 [75 Cal.Rptr. 889, 451 P.2d 721] is instructive on the issue of apportionment of liability for repairs. The Supreme Court in *Sewell* discussed several ways in which a lessee may become obligated to comply with various laws and ordinances regarding the leased premises, structures and uses. In *Sewell*, the lessee was found liable for compliance with laws applicable to the use of the premises (i.e., laws applicable to sewage disposal at the premises operated as a trailer park) because the lessee had contractually assumed that duty and risk. (*Id*. at pp. 673-676.)

However, more to the point in the present case, *Sewell* also addressed another way in which a lessee may obligate himself to comply with laws and ordinances applicable to the premises. ■ The court in *Sewell* emphasized the following: "A lessee who voluntarily puts the premises to uses different from those to which they were put before the creation of his tenancy, and thereby causes the premises to fall within the scope of existing laws not previously applicable to the premises, must bear the burden of conforming his new use to the requirements of the law and of taking all action necessary to rectify any subsequent instances of noncompliance. This rule applies whether the lessee's obligation is viewed as arising from an implied assumption of the lessor's initial duty not to alter the use of the premises under his control without complying with all applicable laws [citations], or whether it is viewed as reflecting an independent duty to comply with the particular laws made applicable by the lessee's new use of the premises. [Citations.]" (70 Cal.2d at pp. 672-673, fn. omitted.)

In the present case, apart from whether Clinical is contractually obligated to bear the cost of conforming the leased premises to legal requirements as the Owners urge, Clinical did, through its sublessee, Discovery, put the premises to a use substantially different from that to which the premises had been previously put. Pursuant to the rule described in *Sewell*, Clinical must therefore bear the financial burden of conforming the new use to the requirements of the law, including pertinent building code requirements.

■ Moreover, the Owners satisfied their burden of establishing that their damages (1) were due to Clinical's breach of its duty to comply with pertinent building code provisions and (2) were not incurred voluntarily or for the benefit of the Owners' subsequent tenant (KSCI), and the trial court awarded damages accordingly. Clinical urges that the Owners failed to

satisfy their burden of proving causation and urges that the Owners were awarded damages in excess of those fairly attributable to Clinical regarding (1) the sprinkler hookup fee, (2) the cost of relocating a storm drain, and (3) the cost of air conditioning repairs.

As to the sprinkler hookup fee, the trial court determined that the installation of the sound stage and supporting facilities triggered a fire safety requirement that the structure containing the stage and facilities either have fire sprinklers or a "one-hour fire separation" in the main corridor of the building so the corridor would resist fire for one hour. Since the fire separation technique required tunnel construction, which was more costly and difficult than the installation of sprinklers, sprinklers were installed as the most practical and reasonable way to bring that building into compliance with building code provisions. Clinical urges that the necessary sprinkler hookup fee should have been apportioned between it and the Owners because the city's hookup fee for connecting the private sprinkler system to the public water system would enable the Owners to establish sprinklers in other buildings on the premises without a hookup fee. However, Clinical's argument amounts to an impermissible effort to set off one of its costs and to diminish its liability for the reasonable cost of putting the leased premises into the required state of repair. (See *Iverson* v. *Spang Industries, Inc.* (1975) 45 Cal.App.3d 303, 308 [119 Cal.Rptr. 399].) The Owners' subsequent use of the hookup for which Clinical was responsible is of no consequence to Clinical.[3] Likewise, the storm drain relocation about which Clinical complains was a cost fully attributable to Clinical because the storm drain had to be moved to make way for the sprinklers in the building for which they were required because of the alterations done by the subtenant.

Clinical further complains that included in the cost of the repairs for the air conditioning were some costs not reasonably attributable to Clinical and for which it should not have been charged. Clinical's claim that an $8,035 item of the damages "included the cost of relocation" of certain air conditioning units at the request of the Owners' new tenant (KSCI) is inaccurate. The $8,035 figure in fact represents the apportioned cost of repairs, as distinct from the relocation costs. Ten new air conditioning units had been installed in conjunction with Clinical's leasehold but were in violation of various code provisions because the units did not have proper supports, condensation drainage, secondary cutoff switches, and attic fire separation.

---

[3]The Owners paid all other costs of sprinklering the other buildings for which Clinical had no obligation under the building code, including the Owners' payment for the costs of underground piping to connect the sprinklers in other buildings to the hookup in the building for which Clinical was responsible. The Owners neither requested nor received these separate costs as damages from Clinical.

KSCI also wanted some of the air conditioning units in need of repair relocated. KSCI and the Owners agreed that one contractor would perform the work of both repairing the units (to satisfy code requirements) and relocating them. The Owners paid only for that portion of the contractor's work which represented the repairs, and that amount was $8,035. KSCI bore the cost of relocation. Thus, in awarding $8,035 for air conditioning repair, the trial court did not hold Clinical liable for KSCI's relocation costs.

III. *The Owners' damage summary was admissible under Evidence Code section 1509.*

The Owners' damage summary was admitted into evidence pursuant to Evidence Code section 1509, which provides as follows: "Secondary evidence, whether written or oral, of the content of a writing is not made inadmissible by the best evidence rule if the writing consists of numerous accounts or other writings that cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole; but the court in its discretion may require that such accounts or other writings be produced for inspection by the adverse party." ▮ The Owners' damage summary, which was prepared from the underlying invoices of repairs and renovations, as well as related time sheets, summarized the cost of repairs which were properly chargeable to Clinical since they were repairs done to remedy either code violations resulting from the alteration of the premises for Discovery's purposes or various conditions resulting from the failure of Clinical to perform required maintenance. The summary omitted the cost of any work not properly chargeable to Clinical, such as work done by the Owners to accommodate KSCI, and thus properly included only a summary of those cost items claimed by the Owners as damages.

Contrary to Clinical's assertion, there was nothing wrong with the Owners' cost summary because it only summarized the parts of the documents which reflected cost items claimed by the Owners as chargeable to Clinical and omitted items not chargeable to Clinical. If the Owners had included essentially irrelevant information in the summary, the document would not have been as valuable in reducing the "loss of time" (Evid. Code, § 1509) to the court in analyzing the numerous pertinent receipts and invoices. Since the summary fairly represented the pertinent portions of the underlying documents, the trial court acted within its discretion in admitting the evidence. (See *Vanguard Recording Society, Inc.* v. *Fantasy Records, Inc.* (1972) 24 Cal.App.3d 410, 418-419 [100 Cal.Rptr. 826]; *Exclusive Florists, Inc.* v. *Kahn* (1971) 17 Cal.App.3d 711, 714-715 [95 Cal.Rptr. 325].)

Clinical points out that the damage summary actually was $400 too low in Clinical's favor. The $400 mistake, which was admitted by the Owners'

expert witness at trial, was taken into consideration by the court and did not render the summary inadmissible. To the extent that there was, as Clinical characterizes it, "one arithmetic error in the amount of $400.00," such an error would affect only the weight and not the admissibility of the damage summary. Although Clinical alludes to "other small errors as well," they are not specified by Clinical and thus not cognizable in this appeal, assuming such errors exist at all.

■ Finally, Clinical contends that the damage summary should have been, but was not, given to it prior to trial. The record establishes that on October 15, 1990, the Owners served on Clinical a list of 14 proposed trial exhibits and one of the exhibits was described as "Plaintiffs' damages summary, with attached invoices, time sheets, and computer genera[t]ed summaries from [the Owners' expert witness] for repair work performed at [the leased premises]." During the five months until the trial began on March 18, 1991, Clinical did not seek to inspect the summary and compare it against the invoices and other backup materials. At trial, Clinical complained that the damage summary was "dumped upon us" moments before the Owners' expert witness began his testimony. After the expert witness's direct examination, the court adjourned to permit the parties to review the damage summary together. When trial convened the next day, Clinical did not suggest that it did not have enough time to review the summary and did not ask for a continuance, but rather extensively cross-examined the Owners' expert witness regarding the details of the damage summary. Accordingly, it is apparent Clinical had a fair and reasonable opportunity to review the damage summary, both prior to and during trial.

DISPOSITION

The judgment is affirmed.

Fukuto, J., and Nott, J., concurred.