Filed 11/10/15  Takeda v. Akiyama Tsukemono California, Inc. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| KAZUTO TAKEDA,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>AKIYAMA TSUKEMONO<br>CALIFORNIA, INC., et al.,<br><br>     Defendants and Respondents. | B261858<br><br>(Los Angeles County<br> Super. Ct. No. YC056502) |

APPEAL from a judgment of the Superior Court of Los Angeles County.
Ramona G. See, Judge.  Reversed and remanded.


Law Offices of Robert W. Cohen, Robert W. Cohen and Mariko Taenaka for
Plaintiff and Appellant.


Law Offices of Joseph F. Hart and Joseph F. Hart for Defendant and Respondent.


_____

Plaintiff Kazuto Takeda appeals from the judgment entered in his favor against defendant Akiyama Tsukemono, California, Inc., contending that in this retrial on the issue of damages the trial court erred by excluding evidence of a damages calculation summary both parties had prepared. We agree and therefore reverse and remand for a new trial on the damages issue.

## FACTS AND PROCEDURAL HISTORY[1]

Kazuto Takeda owned Ebisu Market, a Japanese grocery store in Fountain Valley. Takeda bought pickled food products known as tsukemono from Akiyama Tsukemono California, Inc. For many years Akiyama employee Makoto Miyahara made twice-weekly deliveries to Takeda's market, and Takeda relied on him to check his shelves and determine how much of each product he needed to order.

In order to obtain a discount, Takeda paid in cash at the time of each delivery. Deliveryman Miyahara would give Takeda an invoice showing how much of each product he had delivered, and would then give a copy of that invoice to his employer, the Akiyama company. When Miyahara went on vacation in September 2006, Takeda noticed that the substitute deliveryman was ordering and delivering a much smaller amount of tsukemono products.

Takeda contacted Katsuhisa Yamanaka, the president of Akiyama, and the two prepared a summary based on a comparison of their respective invoices which showed that the market's invoices reflected average deliveries of $300 while the invoice copies turned in to Akiyama showed average deliveries of $100.[2] The market concluded that Miyahara had swindled it for several years by overstating the amount ordered, reporting

---

[1] Some portion of our statement of facts comes from our previous decision in this matter. (*Naylor v. Akiyama Tsukemono California, Inc.* (June 18, 2012, B231028) [nonpub. opn.].)

[2] For ease of reference, we will hereafter refer to Takeda and Ebisu Market collectively as the market and to Yamanaka and Akiyama Tsukemono California, Inc., as the supplier.

the correct lower amount to the supplier, and then pocketing the difference. Miyahara admitted the fraud but contended it worked the other way, with him delivering the correct amount to the market, submitting an invoice to his employer showing that much less had been delivered, and then keeping the difference.

The summary prepared by the market and the supplier was based on twice-weekly deliveries from 2000 through August 2006, and added up to approximately $120,000. Between its deposition testimony and testimony at the damages retrial that is the subject of this appeal, the supplier said it had not yet seen the market's invoices when the summary was prepared, but did see them later. Invoices from 2001 had been water damaged, however, causing both parties to estimate the amounts involved for that year. Even though the figures on the market's invoices matched those supplied by the market for the damages summary, the supplier believed that check marks on the market's invoices meant that the products listed had been delivered, leading it to conclude that the market had received most, if not all, the products and that it was the one that had been cheated. The supplier also testified that the supposed discrepancies were not consistently $200 because his invoices showed that the amount delivered to the market often fluctuated from $70 to $120. The supplier was therefore willing to pay approximately $45,000 to the market to settle the matter. The parties did not reach a settlement.

The market sued Miyahara (the deliveryman) and the supplier.[3]  After a bench trial in 2010, the trial court found Miyahara liable for fraud and punitive damages, but found that the supplier was not liable for its employee's misconduct. The trial court believed that the damages summary prepared by the parties was merely an attempt to calculate damages without any basis. Even so, the trial court accepted the summary's $200 discrepancy calculation, but awarded damages of only $14,400 for once-monthly

---

[3]  That led to an appeal by the market challenging the trial court's decision to grant Miyahara equitable relief from a default judgment, an order that we affirmed. (*Takeda v. Akiyama Tsukemono California, Inc.* (Jan. 28, 2010, B213462) [nonpub. opn.] (*Takeda I.*)

deliveries on the mistaken assumption that there was no evidence concerning the frequency of deliveries.

The market brought a motion to set aside the judgment, contending that the trial court erred by awarding damages based on only one delivery per month and by failing to hold the supplier liable for Miyahara's fraud. The original trial judge had retired and the new judge treated the motion as one for reconsideration. The second judge agreed that the supplier was liable for Miyahara's fraud but declined to increase the damage award because the evidence was in conflict and had led the first judge to come up with a number that the second judge was unwilling to second guess. In its amended statement of decision, the trial court termed the damages summary spreadsheet a "guess" because it was based solely on the delivery invoices, without any supporting documentation such as cash register receipts, inventory records, or other accounts of the market's sales of tsukemono products.[4] The trial court still found that there was an approximate discrepancy of $200 per delivery, but left in place the first judge's finding that deliveries occurred only monthly.

The market appealed the judgment and we reversed. (*Naylor v. Akiyama Tsukemono California, Inc.* (June 18, 2012, B231028) [nonpub. opn.].)[5] We held that both trial courts erred by determining there was no evidence of anything other than monthly deliveries because the evidence was undisputed that deliveries occurred twice-weekly. Even though both trial courts found an average discrepancy of $200 per delivery, we declined to order a eight-fold increase in the judgment, instead ordering a new trial on damages because both judges had been troubled by the adequacy of Takeda's evidence on that point.

---

[4]    Takeda testified at the first trial that he bought the market in 1984 and still used the old cash register system, which did not accept bar codes or otherwise allow for inventory tracking.

[5]    That appeal was brought by the then-bankruptcy trustee for Ebisu Market. For ease of reference, and to avoid confusion, we will refer to it as *Takeda II*.

The damages retrial was conducted by a third judge. The market did not introduce in evidence all of the several hundred invoices showing its purchases from the supplier over the years. Instead, the market relied heavily on the damages summary it prepared with the supplier and introduced a limited number of invoices that it compared with the supposedly corresponding invoices the deliveryman gave the supplier. The trial court allowed the market to testify about the damages summary and then question the supplier about its contents. Based on the damages summary and the previous deposition testimony of the supplier, the market's accounting expert testified that the market's damages were more than $127,000, plus another $136,755 in prejudgment interest. The expert had not audited the market's invoices, relying instead on the supplier's own assessment of what the invoices showed. However, the trial court withheld ruling on the admissibility of the damages summary, in part out of concerns that it had been prepared for settlement, and in part because it was concerned that the document lacked the proper foundation and was based on hearsay. The trial court refused the market's request to admit in evidence all of the invoices toward the end of the trial. The market argued that the supplier would suffer no prejudice because it had already seen the invoices. The market also pointed out that it had elected to rely primarily on the damages summary in order to avoid burdening the court with all of the invoices.

When the supplier later tried to introduce evidence to support its contention that the market received the full amount of products listed on the supplier's invoices, the trial court sustained the market's objections, stating that the two previous trial courts had already determined that "the liability was all on your side."

The trial court issued a statement of decision awarding the market damages of $23,265.55. In order to reach this figure, the trial court ruled that the damages summary spreadsheet was inadmissible because, without the invoices upon which the calculations were based, the document lacked foundation. As a result, the trial court ruled that the testimony of the market's accounting expert was also "of no assistance to the court" because his opinions were based upon the damages summary without any review of the underlying invoices.

5

Absent those invoices, the trial court characterized the market's evidence as a "pitiful bundle" of invoices, many of which were illegible. The trial court believed this court ordered a new trial because we had concluded the evidence supporting the market's claims was "woefully inadequate and troublesome."[6] The trial court noted that the invoices it saw showed that the market was overcharged from $47 to $425 per delivery over the course of several years. After eliminating damages for the years 2000 and 2001 because the market submitted no invoices for those years, the trial court set forth the discrepancies in 118 invoices from 2002 through 2006. The total came to $23,265.55.

The market brought a motion to set aside the judgment, contending in part that the trial court erred by excluding the damages summary spreadsheet evidence and the testimony of its accounting expert. The trial court denied that motion, stating in its minute order that the damages summary was properly objected to because it was hearsay and lacked foundation, and that the trial court therefore had the discretion to disregard the expert's testimony.

**DISCUSSION**

The trial court excluded evidence of the damages summary performed by the market and the supplier, along with the derivative testimony of the market's accounting expert, because it believed that evidence was not admissible unless the market also introduced all the underlying invoices upon which the summary was based. The trial court erred.

Evidence Code section 1523, subdivision (d) provides: "Oral testimony of the content of a writing is not made inadmissible . . . if the writing consists of numerous accounts or other writings that cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole." This section

---

**6**  We did not say that. Instead, we reversed and ordered a new trial on damages in deference to the qualms that the earlier trial courts had about the adequacy of the market's damages evidence. Despite those qualms, however, the first two trial judges felt enough confidence in the damages summary not only to consider the summary but to award damages based on the average discrepancy represented by that summary.

continues without substantive change former Evidence Code section 1509. (Cal. Law Revision Com. com., West's Desktop Evid. Code (2015 ed.) foll. § 1523, pp. 313-314.)

Former section 1509 provided: " 'Secondary evidence, whether written or oral, of the content of a writing is not made inadmissible by the best evidence rule if the writing consists of numerous accounts or other writings that cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole; but the court in its discretion may require that such accounts or other writings be produced for inspection by the adverse party.' " (See *Wolfen v. Clinical Data, Inc.* (1993) 16 Cal.App.4th 171, 182 (*Wolfen*).)

Under this rule, a person who directs or supervises the preparation of a summary may testify to its contents and the summary may be received in evidence. (*Vanguard Recording Society, Inc. v. Fantasy Records, Inc.* (1972) 24 Cal.App.3d 410, 419.) In *Wolfen, supra*, 16 Cal.App.4th 171, the Court of Appeal affirmed the judgment for a commercial lessor to recover the cost of repairs due to damage caused by a tenant. In doing, so, the court held that the trial court properly allowed evidence of the lessor's damages summary, which was prepared from the underlying repair invoices and other documents. (*Id.* at p. 183.)

We conclude that this rule applied to the damages summary jointly prepared by the market and the supplier.[7] First, with eight deliveries a month spanning a period of several years, the market would have had in its possession approximately 544 delivery invoices.[8] That would leave the trial court having to compare an equal number of

---

[7] The supplier does not address this issue at all. Instead, its appellate brief is based on the mistaken notion that the issue is one of substantial evidence to support the judgment. As the market points out in its reply brief, the issue is whether the trial court erred by excluding key evidence. We do not treat this as a waiver by the supplier and therefore reach the issue raised by the market on its merits. (*Planning & Conservation League v. Castaic Water Agency* (2009) 180 Cal.App.4th 210, 227.)

[8] We reach this figure by excluding invoices for the year 2001, which were missing. That leaves invoices for all of 2000 and 2002 through 2005, along with eight months in

7

invoices from the supplier as well, an amount of writings that easily qualifies as numerous. (§ 1523, subd. (d).) Second, even though the supplier had not yet seen the market's invoices when the summary was prepared, it acknowledged receiving those later and confirmed that the figures matched those provided by the market. Third, although the supplier believed that certain check marks on some of the market's invoices indicated that the market had in fact received the full amount of products, the trial court resolved this issue against the supplier when it awarded the market the full amount of the discrepancies shown between the limited sets of invoices that were in evidence. The trial court therefore erred by excluding evidence of the damages summary and, by extension, the testimony of the market's accounting expert.

Even though error occurred, we can reverse only if it is reasonably probable the market would have obtained a different result absent the error. (§ 354; *California Crane School, Inc. v. National Comm. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 24.) As noted, the trial court was willing to award the market the full amount of the discrepancy that was shown by the legible invoices that were admitted in evidence. In fact, the trial court awarded the market $23,265.55 based on the discrepancies shown in 118 invoices. That works out to an average of $197.16 per delivery, remarkably close to the $200 average discrepancy obtained from the parties' damages summary. It is therefore reasonably probable that the market would have obtained a larger damage award had the trial court admitted evidence of the damages summary.

The market asks that we enter judgment for it based on the figures represented by the damages summary. We understand its request and are reluctant to send this case back for another retrial. However, there are some questions that the existence of the damages summary do not answer, especially in regard to the missing invoices from 2001. Although it might be reasonable to infer from the summary that the same average discrepancies occurred during that year, a trier of fact could find otherwise, significantly

2006. At eight invoices a month, the market would have 96 invoices for each full year plus another 64 from January through August 2006.

affecting the potential amount of damages.  We therefore remand the matter for a new trial on the issue of damages.[9]

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial on the issue of damages only.  Appellant Takeda shall recover his costs on appeal.


RUBIN, J.


WE CONCUR:


BIGELOW, P. J.


FLIER, J.

---

[9]     As a result, we need not reach the other issue raised by the market – that the trial court erred by failing to award it prejudgment interest.