[No. S037890. Nov. 23, 1994.]

ROSE HADIAN, Plaintiff and Respondent, v.
EDWARD SCHWARTZ, Defendant and Appellant.

COUNSEL

Esner, Marylander, Zakheim & Higa, Grant Marylander, Rosalyn S. Zakheim, Billie Ann U. Higa and Stuart B. Esner for Defendant and Appellant.

Barton, Klugman & Oetting and Ronald R. St. John for Plaintiff and Respondent.

OPINION

ARABIAN, J.—We granted review of the Court of Appeal's judgment in this case as a companion to our decision in *Brown* v. *Green* (1994) 8 Cal.4th

812 [35 Cal.Rptr.2d 598, 884 P.2d 55], also filed today. As it did in *Brown*, the Court of Appeal concluded that our decision in *Glenn R. Sewell Sheet Metal, Inc.* v. *Loverde* (1969) 70 Cal.2d 666 [75 Cal.Rptr. 889, 451 P.2d 721] (*Sewell*) compelled the conclusion that the nonresidential lease at issue here allocated to the lessee liability for some $34,000 in costs for the seismic reconstruction of a leased building, ordered by the City of Los Angeles as part of a program to enhance earthquake safety. We now reverse that judgment on the authority of our reasoning in *Brown* v. *Green*, having concluded that the material features of the lease, considered in light of the circumstances surrounding the transaction, support the conclusion that the parties intended to allocate to the building's owner responsibility for compliance with government-ordered alterations unrelated to the lessee's particular use.

I

A

On April 14, 1984, plaintiff Rose Hadian and defendant Edward Schwartz signed a lease agreement involving commercial property at 2906 Sunset Boulevard in the Silver Lake district of Los Angeles. Hadian owned the building, constructed of unreinforced masonry, and Schwartz intended to lease it for use as a combined bar and cabaret. The term of the lease was three years at a monthly rental of $650, with an option to renew for an additional five years at a rental of $800 a month. The lease agreement itself took the form of a preprinted "fill-in-the-blank" document entitled "Standard Industrial Lease—Net" published by the American Industrial Real Estate Association, several features of which the parties amended prior to signing it.

Among other amendments to the form lease, the parties struck by lining through two subsections of both the "compliance with law" and "condition of premises" provisions. The first of these stricken provisions consisted of a warranty by the lessor that the premises did not violate applicable building codes, regulations or ordinances in effect at the commencement of the term; in the second, the lessor warranted the condition of the plumbing, lighting, heating and similar building systems. Both stricken provisions would have required the lessor to correct promptly any breach of the warranties. The parties also struck a provision requiring the lessee to pay the real property taxes (and added a provision requiring the lessee to pay only any *increase* in property taxes occurring during the term of the lease) and made additional changes—none of which are pertinent here—by attaching a typewritten addendum to the form lease.

As modified and signed by the parties, the lease required the lessee to "comply promptly with all applicable statutes, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements in effect during the term or any part of the term hereof, regulating the use by the lessee of the premises . . . ." In addition, the lessee agreed to accept the building "in [its] condition existing as of the lease commencement date or earlier, subject to all applicable zoning, municipal, county and state laws, ordinances, and regulations governing and regulating the use of the Premises . . . ." The document also required the lessee to "keep in good order, condition and repair the Premises and every part thereof, structural and nonstructural (whether or not such portion of the Premises requiring repair . . . occurs as a result of Lessee's use, any prior use, the elements or the use of such portion of the Premises) including . . . all . . . walls (interior and exterior), foundation, ceiling, roofs (interior and exterior), floors . . . ." Finally, the lease provided that "Lessor [shall] have no obligation, in any manner whatsoever, to repair and maintain the Premises nor the building located thereon nor the equipment therein, whether structural or nonstructural, which obligation is intended to be that of the lessee under [the maintenance and repair provision] hereof." Lessor remained obligated to pay the premiums for casualty insurance on the building.

In a letter to Hadian dated October 1, 1986, Schwartz exercised his option to renew the lease for an additional five years at the increased rent, the new term to commence on July 24, 1987, the date on which the initial three-year term expired. On March 4, 1987—five months after Schwartz exercised the renewal option and almost five months before the initial three-year term ended—Hadian received a letter from City of Los Angeles officials advising her that the unreinforced masonry construction of the Sunset Boulevard building made it susceptible to substantial structural damage in the event of an earthquake. The letter explained that, under a so-called "earthquake hazard reduction" program enacted by the city in 1981, Hadian, as the building's owner, was required to arrange for a structural survey of the property to determine its susceptibility to earthquake damage and was liable for the cost of any quake-proofing (or "seismic retrofitting") indicated by the survey results; accompanying the letter was an "Earthquake Hazard Reduction Compliance Order" directing Hadian, as the building owner, to meet minimum earthquake standards for a structure of that type within a specified time.

Discussions between Hadian and Schwartz then took place, intended to resolve liability between the parties for the required seismic alterations. After failing to reach an agreement with her lessee, who denied any responsibility for the cost of the quake-proofing work, Hadian authorized and paid

the costs of a survey and redesign of the building, followed by the actual work itself—an extensive undertaking requiring the complete reconstruction of the building's frame and the installation of a new roof—at a cost totaling $34,450.26.

Following completion of the seismic upgrade work and issuance of a certificate of completion by the city, Hadian filed this breach of contract action against Schwartz to recover the cost of the alterations. Her complaint alleged in substance that Schwartz had agreed through a provision of the lease to bear the cost of complying with any alterations ordered by municipal authorities, that the seismic retrofit so qualified, and that Schwartz, having refused to pay the cost himself, was liable to her by way of indemnity. At the conclusion of a bench trial, the superior court ruled in favor of Hadian. Schwartz appealed.[1]

### B

In an unpublished opinion, the Court of Appeal affirmed the judgment of the trial court. It reasoned that such a result was "impelled" by our opinion in *Sewell, supra,* 70 Cal.2d 666, because the terms of the lease in issue, like the lease in *Sewell,* obligated the lessee to assume the duty of keeping the building in repair and complying with all applicable laws. In addition, the court reasoned that, as in *Sewell,* the lessor had assumed no obligation of repair or compliance with laws; nor had the lessor made any representations respecting the condition of the property. Although pointing out that its judgment required Schwartz to pay, in effect, for capital improvements to the building and that such a result was "arguably unfair" because the improvements would benefit primarily the lessor, the Court of Appeal felt compelled by the rule of *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937], to follow what it perceived to be our analysis in *Sewell.* We granted the lessee's ensuing petition for review and now reverse.

### II

### A

As we explain in greater detail in *Brown* v. *Green, supra,* 8 Cal.4th 812, also filed today, our opinion in *Sewell, supra,* 70 Cal.2d 666, "is apt to be misinterpreted as one which, in the search for the parties' intent, exalts a

---

[1] Counsel for Mrs. Hadian argues that the trial court's conclusion that the parties intended to place liability for the cost of the seismic upgrade on the lessee is based on "observations of the parties." The opinion of the Court of Appeal, however, relied entirely on our opinion in *Sewell, supra,* 70 Cal.2d 666, and it is clear that the trial court's conclusion was one of law based on undisputed facts. We may thus properly review de novo both that court's and the Court of Appeal's construction of the lease.

text-bound logic over a close consideration not only of the terms of the lease but of the circumstances surrounding its making." (*Brown* v. *Green, supra,* at p. 825.) The defining feature of *Sewell*—the characteristic of the lease transaction that drove our result in that case—was the fact that the lessee's *use* of the property was both *different* from the lessor's prior use *and* one that led to the government-ordered alteration at issue.

Our opinion pointed out that a change in use that invokes government ordered alterations is one of the principal ways by which a lessee may be deemed to have assumed the cost of compliance. (*Sewell, supra,* 70 Cal.2d at p. 674.) Indeed, we went so far as to observe that anyone using leased property for the purpose of operating a trailer park "must know that laws respecting and regulating such facilities [i.e., waste disposal] would be of primary importance . . . and would be those most obviously included in a clause requiring compliance with all applicable laws." (*Id.* at p. 676.)

As we conclude in *Brown* v. *Green, supra,* 8 Cal.4th at page 825, these considerations are decisive in distinguishing *Sewell, supra,* 70 Cal.2d 666, from cases in which the use is *not* one that provokes the government order at issue. The distinction is, moreover, consistent with both common sense and a reasonable construction of the lease provision. After all, a lessee who, like the one in *Brown* v. *Green,* undertakes the retail sale of furniture on leased property is hardly likely to anticipate that such a use will trigger a municipal demand that asbestos laden fireproofing material coating the building's structural frame be removed at a cost of roughly a quarter of a million dollars. Nor is the government's cleanup demand in such a case one that lies within the reach of a compliance with laws provision confined to laws or orders "regulating the lessee's *use*" of the property. (See *Brown* v. *Green, supra, ante,* at p. 824.)

■ Like the compliance with laws clause at issue in *Brown* v. *Green, supra,* 8 Cal.4th 812, the compliance clause in the lease here is drawn to obligate the lessee to "comply promptly with all applicable statutes [etc.] . . . *regulating the use* by the lessee of the premises . . . ." (Italics added.) The provision, in other words, is not one that on its face obligates the lessee to comply with—and bear the expense of—"requirements that would be applicable to *any* occupancy." (2 Friedman on Leases (3d ed. 1990) Compliance with Laws, § 11.1, p. 689 and cases cited at fn. 8, italics added; see also *Brown* v. *Green, supra, ante,* at p. 825.) Nor, in agreeing to such a provision, is a lessee who intends to operate a bar/cabaret on the property likely to have in mind that his use will provoke a municipal demand that he bear the substantial cost of a virtual reconstruction of the building as a means of strengthening it against the contingency of an earthquake.

We cannot, in other words, endorse the Court of Appeal's view that the text of the compliance with laws clause itself supports the straightforward application of our analysis in *Sewell, supra*, 70 Cal.2d 666, and the conclusion that the lessee assumed responsibility for compliance with "all applicable laws." The Court of Appeal rejected the lessee's contention that the compliance with laws clause related only to his use of the property as a combined bar and cabaret by asserting that the lessee "could not use the premises as a bar/cabaret, or anything else, if the seismic repair were not done and in the next quake the premises were reduced to rubble." In our view, such a characterization of the relationship between a compliance with laws clause limited to a lessee's use and the duty to comply with government-mandated alterations overlooks an essential analytical point.

A compliance with laws provision that is limited to requiring the lessee to obey or comply with laws, orders and other governmental demands *regulating* the lessee's *use* of the leased property does not, by its literal terms, obligate the lessee to comply with laws, regulations, et cetera, that *do not* purport to regulate the use. (See, e.g., *Wolf* v. *2539 Realty Associates* (1990) 161 A.D.2d 11 [560 N.Y.S.2d 24]; *Bush Term. Assoc.* v. *Federated Dept. Stores* (1980) 73 A.D.2d 943 [424 N.Y.S.2d 28]; *Ingalls* v. *Roger Smith Hotels Corporation* (1955) 143 Conn. 1 [118 A.2d 463]; 2 Friedman on Leases, *supra*, § 11.1, at p. 689.) It is no answer to reason, as the Court of Appeal appeared to do in this case, that the lessee is responsible for the cost of compliance because the failure to comply might otherwise lead to the destruction of the leasehold; were that the law, there would be no limit on the lessee's liability for governmental demands, even those demonstrably of benefit solely to the property owner.

### B

■ Because the lessee's use here, like that in *Brown* v. *Green, supra*, 8 Cal.4th 812, differs from the use in *Sewell, supra*, 70 Cal.2d 666, in being unrelated to the property condition that led to the government's compliance order, it follows that the city's order here lies outside the literal scope of the compliance with laws clause of the lease. In light of the resulting uncertainty as to the intention of the parties regarding the duty to comply with laws, regulations, etc., directed at conditions *unrelated* to the lessee's use, we may properly have recourse both to the overall provisions of the lease and the circumstances surrounding its making. (See *Brown* v. *Green, supra*, at pp. 826, 829.) As in *Brown* v. *Green*, we adopt a two-part analysis in resolving that question. (*Ibid.*)

Naturally, the analysis begins with the language of the lease itself. The literal text of the agreement—even so-called preprinted "form" leases—is

presumptively controlling in determining the intent of the parties, always the paramount question in contract cases. If, as in both this case and *Brown* v. *Green, supra,* 8 Cal.4th 812, the language of the lease appears to place the duty of compliance on the lessee, the court then takes the second analytical step. It examines the lease terms in light of a handful of judicially developed circumstantial factors as a means of confirming that the allocation of risk suggested by the text of the lease accurately reflects the probable intent of the parties and leads to a reasonable construction of the lease terms. (*Id.* at pp. 829-830.)

If, on balance, these factors *reinforce* the conclusion suggested by an examination of the text of the lease, the court will conclude that the obligation to make alterations to comply with the law or regulation at issue falls on the lessee. If, however, the assessment is inconsistent with the lease provisions and points to the conclusion that the parties intended that the lessor shoulder the burden of compliance, the court will conclude that the actual agreement of the parties deviates from the literal text of the lease and construe and enforce the agreement accordingly. (See *Brown* v. *Green, supra,* 8 Cal.4th at pp. 829-830, and cases cited; *Sewell, supra,* 70 Cal.2d at p. 674, fn. 10 and authorities cited.)

## III

We come, then, to a consideration of the particulars of the lease at issue in this case. Although the form used by the parties[2]—both the preprinted text and the elimination of provisions by strikeover—make the lease virtually identical to the one we considered in *Brown* v. *Green, supra,* 8 Cal.4th 812, we will conclude in this case that the lessor, rather than the lessee as in *Brown*, agreed to assume the burden of complying with the city's order to make alterations in the property. The means by which we reach such a diametrically opposite conclusion illuminates the process by which courts ferret out the likely intent of the parties and arrive at a reasonable construction of their agreement in cases such as this.

## A

As noted, the lease is self-characterized as being a "net" lease, a type of agreement often used in commercial leases of entire buildings, a defining characteristic of which is the virtually complete transfer of the incidents of

[2]As the Court of Appeal noted, the record indicates that the form lease was selected and prepared by Hadian's attorney and presented to Schwartz for signature while he was confined in a hospital. No claim is made, however, that the circumstances under which the lease was executed affect its validity.

ownership from landlord to tenant. (See *Brown* v. *Green, supra,* 8 Cal.4th at pp. 827-828.) As in *Brown,* the preprinted form used by the parties here not only bears the title "Standard Industrial Lease—Net," but the word "net" appears at the foot of each page. As we remark in *Brown,* however, these facts "[are] not alone decisive. What is persuasive is a consideration of the provisions of the lease agreement as a whole . . . ." (*Id.* at p. 828.) As explained in our opinion in *Brown,* chief among these provisions are the life of the lease and the extent to which the incidents of full ownership of the property are transferred to the lessee. (*Ibid.*) Although the terms of the lease in this case do exhibit *some* features characteristic of a true net lease (e.g., a virtually unqualified covenant to keep the property in repair and a provision purporting to negate any obligation on the part of the lessor to maintain the property), other features —more central to the transfer of ownership issue— suggest the opposite conclusion.

The life of the lease, for example—three years with an option to renew for an additional five years—makes the lease one for a comparatively short term. In addition, the lessor agreed both to pay all but a small yearly increment in property taxes and to obtain and pay the premiums for casualty insurance on the building, obligations that suggest her intention to retain the major benefits and burdens of ownership and which thus tend to negate the conclusion that the parties intended a true "net" lease. (Cf. *Brown* v. *Green, supra,* 8 Cal.4th at pp. 827-828.) Moreover, in the typewritten addendum to the preprinted form, the parties agree that the lessor continues to own all the "fixtures, operating systems and other improvements" in the building, "including the bar, freezer, lighting fixtures, bar cabinets, bar mirrors . . . ," an acknowledgment of continuing ownership that also tends to undermine the view that the parties intended a true net lease.

On balance, these features lead us to conclude that, despite the form characterization of the lease as "net," the lessor did not intend to "forego[] the speculative advantages of ownership in return for the agreed net rental," nor was the lessee "gambl[ing] on the continued value of the location and the improvement . . . and assum[ing] all risk in connection therewith." (Van Doren, *Some Suggestions for the Drafting of Long Term Net and Percentage Leases* (1951) 51 Colum. L.Rev. 186; see also *Brown* v. *Green, supra,* 8 Cal.4th at p. 826.)

B

In addition to concluding from the text of the lease that the parties did not intend to negotiate a true net lease, we apply to the lease and the circumstances surrounding its making the six factors enumerated in *Sewell,*

*supra*, 70 Cal.2d at page 674, footnote 10, factors which we said "reflect a court's determination whether or not the parties to a lease agreed that the lessee assumed certain risks, despite the use of unqualified language." Applying these criteria to the lease and the circumstances surrounding its execution in *Brown v. Green, supra*, 8 Cal.4th 812, we concluded that the *lessees* agreed to accept responsibility for the cost—there, totaling over $250,000—of replacing asbestos laden insulation material applied to steel members supporting the roof of a 45,000-square-foot building leased for a term of 15 years. Applying the same factors to the virtually identical form lease at issue here yields the opposite result, reinforcing our conclusion that the parties intended that the lessor would be responsible for complying with laws unrelated to the particular use made of the property by the lessee.

(1) *The relationship of the cost of the curative action to the rent reserved.*

As noted, the initial three-year term of the lease called for a monthly rental of $650. The total rent reserved over the life of the initial term was thus $23,400. Expressed as a percentage, the cost of compliance with the city's order is almost one and one-half times (145 percent) the cost of the *entire* rent reserved over the three-year life of the lease. Thus, using the initial lease term as a benchmark, the cost of the curative action fairly dwarfs the total rent reserved.

Even if we add to the initial term the five years of the option, renewed by Schwartz some nine months before the end of the initial term and several months before the city's compliance order was served on Hadian, the relationship is still one of significant imbalance. In *Brown v. Green, supra*, 8 Cal.4th 812, we point out that although the cost of complying with the county's asbestos abatement order there—over $250,000—was high as an absolute number, it represented less than 5 percent of the total rent reserved over the 15-year life of the lease, "an expression of value," we said, "that throws a different light on the relative financial magnitude (and hardship) of the undertaking." (*Id.* at p. 830.) Here, of course, these comparative values are inverted. Instead of compliance costs of less than 5 percent of the aggregate rent, the cost of earthquake-proofing the Sunset Boulevard property is roughly *half* of the *total* rent payable by the lessee over the *combined* eight years of the term, or 49 percent.[3]

(2) *The term for which the lease was made.*

Although the question of the length of a lease term is irreducibly relative, most would agree that a term of three years qualifies as "short"; neither do

---

[3]A percentage arrived at by multiplying the monthly rent ($650 and $800) times the two terms (the initial three years and the five-year option to renew) and dividing the cost of the seismic upgrade ($34,000) by the resulting sum ($69,600) to yield a figure of 49 percent.

we think that the addition of the five-year renewal option changes the result. The parties agreed to a lease for a term of three years with the option for an additional five years. In assessing the life of the lease for purposes of determining the intent of the parties with respect to the issue of complying with governmental orders affecting the property, we accord somewhat less weight to the option term than we would to an initial lease of, say, eight years. Under the circumstances here, we conclude that a lease of three years with a five-year option qualifies as a short rather than a long term lease.

■ As our opinion in *Brown* v. *Green, supra,* 8 Cal.4th 812, points out, courts are reluctant to construe a repair or compliance clause literally where the term of the lease is short, the lessee has little time in which to amortize the cost of repairs over the life of the lease, and the cost of repair or compliance represents a substantial percentage of the aggregate rent over the term. "Where the term of the lease is short," we noted, "it is highly unlikely that the lessee would have expected to assume responsibility for the cost of alterations that are, in effect, capital improvements to the property that will benefit primarily the owner." (*Id.* at p. 831.) As one commentator has observed, under such circumstances, "there is a virtual refusal of the courts to construe this language literally." (1 Friedman on Leases, *supra,* Repair, § 10.601, p. 656.)

■ (3) *The relationship of the benefit to the lessee to that of the reversioner.*

Here again, it is plain that, as the Court of Appeal itself pointed out, the primary benefit of the seismic work will inure to Hadian, the building's owner. Although the record does not inform us of the estimated useful life of the building, it is safe to assume that its substantial reconstruction and "hardening" against earthquake damage will last for more than the five years remaining on the lease. The record here, we conclude, unlike that in *Brown* v. *Green, supra, ante,* is sufficient to support the conclusion that the work will primarily benefit the lessor. The record is also clear that the earthquake-proofing reconstruction ordered by the city resulted from the classification of the building *itself* as being of a type—unreinforced masonry—that is especially susceptible to severe damage during an earthquake. The city's compliance order was not the result of activity on the property or prompted by the lessee's particular use. Thus, this factor as well points to the building owner as the party responsible for compliance costs.

(4) *Whether the curative action is structural or nonstructual in nature.*

Little argument is needed to establish both the substantiality and structural nature of the seismic retrofit required at the Sunset Boulevard building. As

the record confirms, the upgrade entailed the insertion of a new steel frame into the core of the building, the installation of plywood shear walls and foundation anchors, and the construction of a new roof—work that literally qualifies as "structural."

(5) *The degree to which the lessee's enjoyment of the premises will be interfered with while the curative action is being undertaken.*

The record is unfortunately silent on this aspect of the analysis. We may, however, surmise that the substantial reconstruction of the building's structural frame and the addition of a new roof were not *un*intrusive, and conclude that application of this factor does not, at least, favor the lessor. (See *Brown* v. *Green, supra*, 8 Cal.4th at pp. 832-833.)

(6) *The likelihood that the parties contemplated the application of the particular law or order involved.*

A negative answer to this query favors the case for the lessee: responsibility for the consequences of events affecting leased property that are truly unanticipated is likely to be that of the lessor, who generally has the financial resources and long-term investment interest to respond to such events. Yet here again, the record is not definitive. Although it is common knowledge that southern California is "earthquake country," the extent to which the parties were aware of a city code program designed to upgrade unreinforced buildings and that that eventuality could have been contemplated by both or either at the time the lease was signed are questions not clearly answered by the record before us.

The record *does* include copies of letters to Mrs. Hadian from the city's department of building and safety dated September 20, 1967, and July 31, 1968, ordering the removal of building parapets along the Sunset Boulevard side and the anchorage of exterior walls to the roof frame, and subsequently acknowledging the completion of those changes. These alterations were ordered as part of the city's code program of removing building parapets that might pose a threat to pedestrians in the event of an earthquake. It is also likely that Hadian, as the owner of a building constructed of unreinforced masonry, was more likely than her lessee to be aware of the city's earthquake hazard reduction program, enacted in 1981, some three years before the lease commenced. On balance, it is appears fair to charge the owner with at least a general awareness, based on past experience, of the possibility that the ownership of property within an earthquake zone might entail government demands that the building be renovated in particular ways.

Perhaps the most that can be said of this factor is that it does not tip decidedly in favor of either party.

## C

Although the uses by the lessees in neither *Brown* v. *Green, supra,* 8 Cal.4th 812, nor this case fell within the text of the compliance with laws clauses or triggered the government orders at issue, a comparison of the circumstances relevant to determining compliance responsibility in the two cases leads us to conclude that, unlike the case in *Brown* v. *Green,* the probable intent of the parties here was that the *lessor* would bear the cost of complying with orders not arising from the lessee's particular use of the property. The material features of the lease and surrounding circumstances in this case and those in *Brown* v. *Green* differ with respect to almost every controlling factor: Differences in the amount of the monthly rent ($28,500 *versus* $800), the life of the lease (fifteen years *versus* three years, with a five-year option), the cost of compliance alterations as a percentage of the aggregate rent (less than 5 percent *versus* 49 percent), prior notice of the potential for compliance problems (written notice in *Brown* v. *Green,* none in this case) and the extent of the alterations entailed by compliance (removing fireproofing material sprayed on beams supporting the roof *versus* a virtual reconstruction of the building, including steel framing and reroofing), support that conclusion, leading us to reverse the judgment of the Court of Appeal.

We also are carried to our conclusion by the manifest unfairness of the result reached by the Court of Appeal, a fact that court acknowledged. Although the Court of Appeal regarded itself as constrained by the duty of deference owed to a prior decision of this court, we have concluded that it construed our opinion in *Sewell, supra,* 70 Cal.2d 666, as one imprisoned by its own logic. We now correct that misreading, confident that our reasoning in *Sewell* was never intended to produce the result reached by the courts below.

## CONCLUSION

The judgment of the Court of Appeal is reversed and the cause is remanded with directions to vacate the judgment of the trial court and to enter judgment in favor of defendant.

Lucas, C. J., Mosk, J., Kennard, J., Baxter, J., George, J., and Werdegar, J., concurred.