**PRUDENTIAL INSURANCE COMPANY OF AMERICA, Plaintiff–Appellant,**

v.

**The L.A. MART, Defendant–Appellee.**

No. 93–56662.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 2, 1995.

Decided Oct. 20, 1995.

Ira G. Rivin, Rutan & Tucker, Costa Mesa, California, for plaintiff-appellant.

Bruce G. Merritt, Debevoise & Plimpton, Los Angeles, California, for defendant-appellee.

Before: FLETCHER, BRUNETTI, and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

Prudential Insurance Company of America ("Prudential") appeals the district court's summary judgment for the L.A. Mart ("L.A. Mart"), in Prudential's diversity action for declaratory relief establishing the parties' duties to pay the costs of seismic upgrading undertaken by Prudential upon the "Mart Building," a commercial structure owned by Prudential and leased to L.A. Mart. Prudential maintains that the net lease ("the Lease") places the duty to rectify dangerous conditions, including seismic weaknesses, upon the tenant. L.A. Mart responds that in the absence of existing damage to the Building or any governmental ordinance requiring a seismic upgrade, it has no duty to make or pay for such alterations. We affirm the district court.

I

This case arises from a lease agreement originally entered into in 1958 by Prudential and the Furniture Manufacturers Association ("FMA"), concerning the 12–story Mart Building, built between 1956 and 1958. FMA sold the Mart Building to Prudential and concurrently leased it back in a transaction known as a "sale-leaseback," under which the lessee typically maintains most of the interest in and responsibility for the Mart Building. The contracting parties were represented by counsel, and the lease was a standard form commonly used by Prudential in undertaking such transactions. The initial term of the lease was 25 years, renewable up to 65 years, and the net annual basic rent was $647,500.00. There are 8 years remaining on the lease, and L.A. Mart has an option to renew for an additional 20 years.

The pertinent terms of the Lease are as follows:

Article VI requires the lessee to "take good care of the premises," keeping it "in good order and condition," and at its own cost to "make all necessary repairs, interior and exterior, structural and nonstructural, ordinary as well as extraordinary, foreseen as well as unforeseen." "Repairs" include "replacements or renewals when necessary."

Article VII requires the lessee to "comply with all laws and ordinances and the orders, rules, regulations and requirements of all federal, state and municipal governments and appropriate departments, commissions, boards and officers thereof. ... and ... with the requirements of all policies of public liability, fire and all other policies of insurance at any time in force."

Article VIII gives the tenant the right to make improvements and alterations with permission of the landlord.

Article X prohibits the tenant from committing or allowing waste or damage to the Mart Building.

Article XV requires the tenant to indemnify the landlord against personal injury claims.

Article XVI requires the tenant to "repair, restore or rebuild" the Mart Building in case of damage or destruction.

In 1982, L.A. Mart, a California partnership, acquired FMA and became the master tenant of the Mart Building. L.A. Mart leases space in the Building to more than 250 tenants and generates more than $10 million in annual revenues. Prudential takes twenty-five percent of the net profits (and thus pays twenty-five percent of L.A. Mart's Building-associated costs). To date, L.A. Mart has elected to undertake, in accordance with the lease, significant improvements to the Mart Building (including air conditioning and a computerized elevator system). In 1989, pursuant to an order of the City of Los Angeles Fire Department, L.A. Mart installed a sprinkler system costing several million dollars.

In the mid-eighties, Prudential undertook an investigation of the Mart Building's ability to withstand earthquakes. Earthquakes to date have left minor cracks in the Building, but Prudential does not argue that these require repair. Two engineering firms hired by Prudential recommended seismic retrofitting or upgrading. The upgrading was recommended to improve upon the original design of the Building and is not necessitated by any existing damage to or deterioration of the Building.

Although the Mart Building's structural design does not meet the seismic requirements for new buildings under today's building codes, it is currently in good repair and in compliance with all applicable building and safety codes and laws. Nevertheless, Prudential maintains that without upgrading, the Building is likely to suffer severe damage in the event of a major earthquake, and is thus a potential danger to its occupants. Prudential submits the analyses of the two engineering firms it hired as evidence of seismic risk to the building. The engineering firm of Dames & Moore opined that stiffness of the frame and columns of the building could result in "possible partial collapse" "under severe earthquake conditions." The firm bases its estimate of collapse potential on the occurrence of an "Upper Level Earthquake" ("ULE"), an event defined as having a "10 percent probability of being exceeded in 50 years." The firm also considered a "Lower Level Earthquake" ("LLE"), defined as "an event with about a 50 percent probability of being exceeded during the 50-year estimated lifespan of the facility." Its opinion concerning the likelihood of collapse is based on a ULE analysis. The estimated cost of upgrading is stated to be four to six million dollars.

A second firm, Lindvall, Richter & Associates, estimated the "probable maximum loss" in case of earthquake to be "in excess of 30 percent of the structure's replacement value." It proposed remedial measures which "could reduce the probable maximum earthquake loss to a minimum of about ten percent." The firm estimated costs at two to three million dollars.

Prudential brought the engineering reports to the attention of L.A. Mart, and informed L.A. Mart that "under Article VI it

is your responsibility to make all *necessary* repairs at your sole cost and expense." L.A. Mart refused to undertake or pay for the upgrading, asserting it was under no obligation to improve the property. Prudential began the upgrading work itself, but continued to insist that L.A. Mart take financial responsibility. L.A. Mart continued to deny any obligation to do so.

In June 1992, Prudential filed a complaint against L.A. Mart in the district court for declaratory relief, specific performance, damages and ejectment. The district court executed without modification a Statement of Uncontroverted Facts and Conclusions of Law prepared by L.A. Mart. The facts adopted by the district court include findings that the Mart Building is "currently in compliance with all applicable requirements of the City of Los Angeles Building and Safety Code and all local and state statutes, ordinances and regulations relating to its structural integrity. No seismic retrofitting is required under any such statutes, ordinances and regulations;" further, "[t]he seismic upgrade that Prudential seeks to require The L.A. Mart to perform is not required to restore any broken or deteriorated element of the Mart Building."

The conclusions of law adopted by the court include holdings that the proposed seismic upgrade is "not a repair within the meaning of the Lease, but rather constitutes an alteration or improvement" which is "not required by any applicable law or ordinance. The L.A. Mart is not required by the Lease to undertake or pay for the proposed seismic upgrade.... [Nor has it] breached any obligation to plaintiff Prudential under the terms of the Lease." The district court granted L.A. Mart's motion for summary judgment on September 30, 1993. Judgment was entered on October 1, 1993. Prudential timely appeals.

## II

■ We review a grant of summary judgment *de novo*. *Jones v. Union Pacific R.R.*, 968 F.2d 937, 940 (9th Cir.1992). We affirm only if the evidence, read in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to

any material fact, and the moving party is entitled to judgment as a matter of law. *Taylor v. List*, 880 F.2d 1040, 1044 (9th Cir.1989); Fed.R.Civ.P. 56(c). We must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir.1992), *rev'd on other grounds,* —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994).

Prudential makes three arguments in support of its claim that L.A. Mart must bear all or most of the costs of the seismic retrofitting work it has begun on the Mart Building. First, it contends that the duty to repair set out in Article VII of the lease encompasses the retrofitting. Second, it argues that the "laws" with which L.A. Mart must comply under Article VI of the lease denote not only statutes and ordinances but also tort law generally, with its attendant duties of care. Third, Prudential avers that the lease taken as a whole and the parties' conduct to date imply the parties' intention to put all responsibility for eliminating "dangerous conditions" upon L.A. Mart. Prudential argues that the approach taken by the California Supreme Court in *Sewell Sheet Metal v. Loverde,* 70 Cal.2d 666, 75 Cal.Rptr. 889, 451 P.2d 721 (1969), and most recently in *Brown v. Green,* 8 Cal.4th 812, 35 Cal.Rptr.2d 598, 884 P.2d 55 (1994), and its companion case, *Hadian v. Schwartz,* 8 Cal.4th 836, 35 Cal. Rptr.2d 589, 884 P.2d 46 (1994), mandates consideration of such factors, and precludes the judgment issued by the district court.

1. Duty to repair under the Lease.

■ Prudential maintains that the "extraordinary breadth" of the repair clause "compels the most expansive possible definition of the term 'repair.'" Prudential quotes from *Realty and Rebuilding Co. v. Rea,* 184 Cal. 565, 194 P. 1024 (1920), and *Whalen v. Ruiz,* 40 Cal.2d 294, 253 P.2d 457 (1953). "To repair means to mend an old thing, not to make a new thing; to restore to a sound state something which has become partially dilapidated, not to create something which has no existence," *Rea,* 194 P. at 1029; "[t]he word 'repair' in its ordinary sense relates to

the preservation of property in its original condition, and does not carry the connotation that a new thing should be made or a distinct entity created." *Whalen,* 253 P.2d at 460.

L.A. Mart cites the same decisions in support of its argument that "repair" does not mean "alter" or "improve." We find that the sentences quoted above do not support Prudential's argument that the retrofitting constitutes "repair." "Preservation" of the "property in its original state" clearly does not entail structural overhaul, where there is no damage or deterioration to the building.

Citing the requirement of Article VI that the tenant "keep [the building] in good order and condition," Prudential argues that "[a] building with a latent design defect rendering it vulnerable to collapse in a major earthquake is not in 'good condition and repair.' " Prudential cites *Strecker v. Barnard,* 109 Cal.App.2d 149, 240 P.2d 345 (1952), for the proposition that things that are not "dilapidated" may yet need work. In *Strecker,* a lessee was required to install safety equipment in an elevator "otherwise in good condition" to comport with an order of the Division of Industrial Safety. *Id.,* 240 P.2d at 347.

The repair articles in the Lease are assuredly broad; if the building is damaged or destroyed in an earthquake during L.A. Mart's tenancy under the lease, L.A. Mart will undoubtedly have to repair or rebuild it. Anticipating this, L.A. Mart carries fifty million dollars earthquake insurance on the Mart Building. Furthermore, L.A. Mart does not dispute that it must comply with agency orders and regulations. When the Fire Department ordered a sprinkler system installed in 1989, L.A. Mart installed one. But no such agency orders have been issued with regard to seismic upgrading of the Mart Building.

■ Finally, Prudential argues that if the seismic work is done, "the Building will have been restored to the safe and sound condition the parties *believed* it was in when they executed the Lease." We cannot accept this strained definition of the requirement to re-

pair. To "restore to a sound state something which has become partially dilapidated" applies to the changed physical condition of an object or piece of property; it does not imply restoration of a former belief or sense of security. Physically, the parties agree, the Building is in the same condition as it was when it was originally bought and leased. Neither of the parties was deceived into believing it sound. Standards of safety may have changed in light of recent seismic events, but until the California state legislature or the appropriate agencies determine and specify what standards are required of older buildings, changes in existing structures are not mandated by covenants to repair.

### 2. Compliance with "laws" under the lease.

In answer to L.A. Mart's objection that there are no statutory provisions or ordinances obligating them to perform seismic upgrade of the Mart Building, Prudential contends that the "laws" with which L.A. Mart is supposed to comply under Article VII denote not only statutes or agency regulations, but also "unwritten" laws, or case law. Accordingly, Prudential argues, the lease obliges L.A. Mart to fulfill general tort law requirements, which include the legal duty of care owed by a property owner or landowner to eliminate known dangers threatening tenants or guests.

We are not convinced by L.A. Mart's argument that the State has preempted the field of safety regulation. The case it cites, *Cedar Shake and Shingle Bureau v. City of Los Angeles,* 997 F.2d 620 (9th Cir.1993), does not sweep as broadly as L.A. Mart suggests. In *Cedar Shake,* we held it was "uncertain" whether a local ordinance was preempted by state law. *Id.* at 626. The case does not stand for the proposition that state tort law remedies are preempted. L.A. Mart does not substantiate its implicit claim that if an injured tenant were to bring suit against itself or Prudential in the aftermath of an earthquake damaging the Mart Building,

personal injury claims based on state tort law would be precluded.[1]

Prudential cites *Rowland v. Christian,* 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 (1968), which held a tenant liable for injuries incurred by a guest in handling a defective faucet; the court stated that "everyone is responsible for an injury caused to another by his want of ordinary care or skill in the management of his property," and that the possessor of land must "act[ ] as a reasonable man in view of the probability of injuries to others." *Id.,* 70 Cal.Rptr. at 104, 443 P.2d at 568. *See also* Cal.Civ.Code 1714(a) (West 1985 & Supp.1994) ("Everyone is responsible, not only for the result of his willful acts, but also for injury occasioned to another by his want of ordinary care or skill in the management of his property or person."); Cal.Civ. Code 1708 (West 1985 & Supp.1994) ("Every person is bound, without contract, to abstain from injuring the person or property or another, or infringing upon any of his rights.").

Prudential interprets *Rowland* and these statutes to mean that "every person has a duty not to injure another, not just to pay damages after an injury occurs." Prudential apparently seeks to avoid the practical and legal truth that, by definition, a tort has not been committed until an injury occurs. In the case at hand, it has not been proven that L.A. Mart has a duty to perform or pay for the seismic upgrade desired by Prudential. Even assuming, arguendo, the existence of such a duty in tort, however, the breach thereof would not make L.A. Mart liable in the absence of resultant harm or injury, among other factors. *See* Restatement (Second) of Torts § 4 (1965), defining "duty" for the purposes of tort law:

> [W]hether or not [an actor] is liable depends upon whether his breach of duty results in an injury to someone to whom the duty is owing in such a manner as to make the breach of the duty a legal cause of the injury, and this depends on the course of events subsequent to the actor's breach of his duty, a matter over which the actor has no effective control.

Moreover, an "actor's duty in tort is often to conduct himself in a manner the propriety of which is to be determined ex post facto by the jury." *Id.* Not surprisingly, Prudential is unable to cite any tort case dealing with judicial enforcement of precautionary measures *prior* to the occurrence of an injury and an attendant complaint asserting damages.

L.A. Mart argues that "[a] lease obligation that requires a tenant to anticipate any possible future tort claim is wholly unreasonable and unworkable." Prudential objects to L.A. Mart's coldhearted "wait-and-see" approach, but its policy arguments are simply not viable. While we agree with Prudential that the interests of public policy are well served by precautionary measures undertaken by private initiative, such measures cannot, in the absence of government regulatory guidelines, be articulated and enforced by courts of law.

The instant case makes this clear. Given the difficulties not only of predicting earthquakes, but also of predicting which sort of structural design is necessary or even best able to withstand earthquakes of various dimensions, it is impossible to state as a matter of law which of the proposed measures should be taken. Should L.A. Mart be required to effect the two million dollar plan, or the three, four, or six million dollar plan? This sort of inquiry should be addressed and resolved by the appropriate legislative bodies, rather than the judiciary.

While there is considerable overlap in the functions of legislative and judicial bodies, we can say that the legislative function is one which generally "operates prospectively in time and action ... to create a 'primary right' which was formerly unavailable." *See* Sutherland Statutory Construction § 1.06 at 11 (4th ed. 1985). The adjudicative function, on the other hand, operates "retrospectively, and creates a 'secondary right' upon the basis of an existing primary right." *Id.* As Justice Holmes put it:

> "A judicial inquiry investigates, declares, and enforces liabilities as they stand on

---

1. A successful state tort action based on failure of the Mart Building's owner or lessor to seismically upgrade it is not inconceivable. This is the sort of action Prudential presumably seeks to avoid. Ironically, such an action could have an effect similar to a future Government regulation requiring seismic upgrade—too late for Prudential's present purposes.

present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter. . . ."

*Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908). Analysis of risk and the social costs and benefits of measures which might be taken to reduce risk, is generally within the province of the legislative and regulatory bodies whose duty it is to prescribe and delimit rules of public safety.

### 3. *Sewell* factors.

Prudential complains that the district court erred by focusing narrowly upon Articles VI and VII of the Lease, rather than looking at the Lease as a whole to infer the parties' intent. Prudential relies heavily on the California Supreme Court's adoption of a two-step analysis in *Sewell* and progeny to determine the contractual intent of lessor and lessee in order to allocate costs for government mandated alterations or repairs to the leased property.

In *Sewell,* the court considered the contractual meaning of a lessee's duty to repair under a trailer park lease, after the Department of Public Health ordered the lessee to comply with a sewage system safety ordinance. 75 Cal.Rptr. at 891–92, 451 P.2d at 723–24. Because the required repairs were substantial in nature, the court looked beyond the language of the covenant to repair to ascertain the parties' intent as to which of them, landlord or tenant, had assumed the risk of such repairs. *Id.* at 894, 451 P.2d at 726. In a footnote, the court indicated six factors "that offer insight into the probable intent of the parties." *Id.* n. 10. These are:

(1) the relationship of the cost of the curative action to the rent reserved, (2) the term for which the lease was made, (3) the relationship of the benefit to the lessee to that of the reversioner, (4) whether the curative action is structural or non-structural in nature, (5) the degree to which the lessee's enjoyment of the premises will be interfered with while the curative action is being undertaken, and (6) (in cases involv-

ing compliance with laws or orders) the likelihood that the parties contemplated the application of the particular law or order involved.

*Id.* Recently, the California Supreme Court explicitly adopted these factors in considering two cases involving government-ordered alterations to leaseholds. *See Brown,* 35 Cal. Rptr.2d at 600, 884 P.2d at 57, 66–69; *Hadian,* 35 Cal.Rptr.2d at 594–97, 884 P.2d at 51–54.

Prudential argues that analysis of the factors leads to the conclusion taken by the court in *Brown,* where costs for asbestos removal were imposed on a commercial lessee. (In *Hadian,* consideration of the *Sewell* factors led the court to conclude that the lessee was *not* obligated to assume the costs of an earthquake hazard reduction regulation.) It is true that like the lessee in *Brown,* L.A. Mart is a participant in a long-term net lease, pays substantial rent, and enjoys substantial benefits relative to Prudential. However, Prudential misses a crucial step in the analysis. All three cases deal explicitly, and not incidentally, with instances of government-imposed curative action. *Sewell* distinguished at the outset between, two similar but unrelated duties that often overlap and may create unnecessary confusion. The first, not directly involved in this case, is the duty to repair or maintain the premises in the absence of special laws or governmental orders. Since no general public policy requires that private property and the improvements thereon be maintained in good condition at all times, a private property owner is under no general duty to correct defective conditions. . . . Similarly, a lessee is under no general duty to correct defective conditions on the leased premises except when necessary to prevent waste or to rectify dilapidations caused by his own lack of ordinary care. Thus, with regard to the duty to repair or maintain, many dilapidations may go unrectified, neither the lessor nor the lessee having a duty to ameliorate the condition, but each having assumed the risk that the dilapidation will decrease the use or value of his interest.

75 Cal.Rptr. at 892, 451 P.2d at 724 (footnote and citations omitted). The court went on to state that:

A different conclusion must be reached, however, when preventative or reparative actions are required by laws and orders governing the premises and their uses. In such a case public policy requires that someone at all times be obliged to comply with such laws and orders, and parties to a lease will not be permitted to create a hiatus in their respective duties of compliance.

*Id.* This is the situation the court faced in *Sewell,* and the context for its analysis of factors informing the intent behind the covenant to repair. The same is true of the two most recent California Supreme Court cases. *Brown* states that "we apply these established [Sewell] factors" to resolve "ambiguity as to how the parties intended to allocate responsibility for compliance with *government-ordered alterations* unrelated to the lessees' use." 35 Cal.Rptr.2d at 600, 884 P.2d at 57 (emphasis added). *Hadian* is similarly concerned with city orders that appear to lie outside the literal scope of the terms of the lease. 35 Cal.Rptr.2d at 594, 884 P.2d at 51. The *Sewell* analysis is dependent on the existence of such orders.

In a sense, Prudential's case is unripe. Should the state or local government decide to enforce a seismic upgrade policy affecting buildings such as the Mart Building, and should L.A. Mart refuse to comply or bear the costs of compliance, Prudential could then bring a case for relief and ask the district court to interpret the lease in light of the *Sewell* factors. Prudential understandably fears that an earthquake may occur before this comes to pass. Even accepting, for the purpose of this appeal, that the state of the building constitutes a general but indeterminate danger given the risk of earthquakes in the Los Angeles area, we conclude that in the absence of a government order to perform specified seismic upgrade procedures, we cannot require L.A. Mart to perform or pay for such an upgrade.

### III

■ Prudential further argues that the district court erred in failing to consider the testimony of its expert, Alan Wayte, concerning net leases and the past conduct of the parties. L.A. Mart contends that the testimony was precluded by the parol evidence rule and that the past conduct is uncontroverted. Under California law, the parol evidence rule is liberal, the state Supreme Court having abolished the "plain meaning" rule in 1968. *See Hayter Trucking, Inc. v. Shell Western E & P, Inc.,* 18 Cal.App.4th 1, 20, 22 Cal.Rptr.2d 229 (1993). Extrinsic evidence is inadmissible to alter or contradict a written agreement, *see e.g. Banco Do Brasil S.A. v. Latian, Inc.,* 234 Cal.App.3d 973, 1009, 285 Cal.Rptr. 870 (1991), *cert. denied,* 504 U.S. 986, 112 S.Ct. 2967, 119 L.Ed.2d 588 (1992), but it may be offered to show custom or usage, or to show "mutually shared meanings of words used irrespective of their ordinary meaning." *Hayter,* 18 Cal.App.4th at 20, 22 Cal.Rptr.2d 229.

The readiness of the California Supreme Court in *Brown* and *Hadian* to consider the context in which a contract was made in addition to the plain language of the text demonstrates the liberality of its approach. L.A. Mart argues that Mr. Wayte's testimony was offered to contradict the meaning of the lease, but this appears inaccurate. In any case, the gist of Mr. Wayte's testimony is laid out in *Brown,* which devotes several paragraphs to description of "net" leases. *Brown* quotes 1 Friedman on Leases (3d ed. 1990) Repairs, § 10.8, pp. 672–73, to explain that:

A net lease presumes the landlord will receive a fixed rent, without deduction for repairs, taxes, insurance, or any other charges, other than landlords' income taxes. Accordingly, the repair clause requires the tenant to make all repairs, inside and out, structural and otherwise, as well as all necessary replacements of the improvements on the premises (and to comply with all legal requirements affecting these improvements during the term.)

*Brown,* 35 Cal.Rptr.2d at 607, 884 P.2d at 64. The court explained that the word "net" alone was not decisive, but rather,

the lease agreement as a whole, including its comparatively long 15–year term, the lessees' agreement to pay property taxes, to assume the risk of third party liability and to insure against that risk, the unqualified nature of the repair clause, the lessor's "negative" covenants with respect to

any obligation to maintain or repair the property, and the elimination of any warranties on the part of the lessor.

It is, in short, reasonably clear from the four corners of the agreement itself that the parties intended to transfer from the lessor to the tenants the major burdens of ownership of real property over the life of the lease.

*Id.* at 608, 884 P.2d at 65 (emphasis omitted).

██ The lease agreement between Prudential and L.A. Mart is undisputedly a net lease of the kind described in *Brown*. The result in *Brown* indicates that L.A. Mart would undoubtedly be called upon to pay for the costs of a government-ordered seismic upgrade. The past conduct of the parties leads to the same conclusion. FMA and L.A. Mart have made all necessary repairs and elective improvements to the Mart Building in the thirty-seven-year life of the lease, including government-ordered installation of a multi-million dollar sprinkler system. But inclusion of the extrinsic evidence relied upon by Prudential would not change the tenor or outcome of this case. If the district court erred in failing to consider this evidence, its error was harmless.

Until the government—federal, state, or local—calls for seismic upgrade in older buildings like the Mart Building, this court cannot require L.A. Mart to make or pay for the upgrade Prudential wishes to see completed. We therefore affirm the district court's judgment.

AFFIRMED.